Kenneth L. WALLIS et al., Appellants,

v.

**LIBERTY MUTUAL INSURANCE COMPANY et al., Appellees.**

No. 17583.

Court of Civil Appeals of Texas, Dallas.

March 12, 1971.

Rehearing Denied April 9, 1971.

Wm. Andress, Jr., Andress & Woodgate, Dallas, for appellants.

George C. Chapman, Thompson, Knight, Simmons & Bullion, Dallas, for appellees.

BATEMAN, Justice.

The plaintiffs were Kenneth L. Wallis and William Enochs, partners doing business as Contour Chair Lounge Company, suing the defendants Liberty Mutual Insurance Company and its salesman, Ray Jackson, to recover the amounts of two losses by theft from their warehouse in Dallas, Texas, one occurring on or about July 22, 1966 and the other on or about August 11, 1966.

Plaintiffs' theory of their right to recover is that they are entitled to damages for the wrongful conduct of the insurance company and its salesman in failing to issue proper insurance coverage as they had been "instructed" to do by plaintiffs and as they had orally agreed to do. The cause of action is, therefore, not based on an alleged oral contract of insurance, but for damages for breach of a duty to insure the plaintiffs against loss by theft. The parties will be designated as they were in the trial court, except that the insurance company will sometimes be referred to merely as Liberty.

The trial court, sitting without a jury, rendered a judgment containing findings: (1) that plaintiffs were not entitled to recover for the first loss of $772.20; (2) but that during the week following that loss they 'instructed" Jackson, agent of Liberty, "to write insurance for them to protect them against a similar loss, and that Jackson, as agent for the insurance company agreed to do so"; (3) that plaintiffs left to the defendants "the form of such protection, and thereby the Defendants had the duty to issue such insurance, or notify the Plaintiffs of their refusal or inability or delay in doing so"; (4) that defendants did not issue any such policy of insurance; (5) that plaintiffs suffered a second theft loss in the amount of $1,462.79 on or about August 11, 1966, (6) for which defendants are liable, but (7) that they are entitled to set off $377 as premium that would have been earned if the policy had been issued. Judgment was given plaintiffs for $1,085.79 with interest from the date of trial. All parties have appealed from this judgment.

In three points of error on appeal the plaintiffs urge: (1) there is no legal basis for allowing the company a premium for a policy which it did not issue and would not have issued; (2) there is no evidence to support the finding as to the amount of premium set off against their recovery; and (3) the defendants were liable for the first loss because plaintiffs had "entrusted their insurance program to defendants with instructions to protect them against losses in their business operations." The defendants present 25 cross-points on appeal, which will be noticed later in detail.

*Facts*

Plaintiffs had for years placed all their insurance with Liberty through whatever agent Liberty assigned to handle their business. They were not knowledgeable about insurance and depended on Liberty and the salesman assigned to them to suggest whatever insurance coverage they needed. They had never discussed theft insurance with any of Liberty's agents. Jackson first came to them in January, 1966 and they discussed insurance with him generally, but nothing specific, such as theft, burglary, fidelity bond coverage, or business interruption insurance; they just talked in general terms of being fully protected.

Plaintiffs had a retail store and a separate warehouse in Dallas, a retail store in Houston, and a combination retail store and warehouse in San Antonio. Their first theft loss occurred at the Dallas warehouse about July 26, 1966, amounting to $772.20. They reported it to Liberty the next week, found they had no theft coverage, and at that time they told Jackson they

wanted coverage against any similar loss, and that in addition to the three retail outlets mentioned they had exhibits at medical conventions and needed a policy that would also take care of that. Jackson told them he thought an inland marine type of policy would probably be most suitable for them, and they told him to cover them "the best way that he saw fit."

Approximately two weeks after the first loss, on about August 11, 1966, a second theft loss occurred at the same warehouse, this loss amounting to $1,462.79. Upon reporting this to Liberty plaintiffs were again informed they had no coverage. Wallis testified he then went to Liberty's office, found that Jackson was at his home on vacation, and that Jackson told him over telephone that he was working on the policy "and trying to complete it," that it was on his desk, and assured Wallis that they were covered and that everything was "in order." Liability was denied and this suit was filed on November 23, 1966, shortly after which Liberty cancelled all of the policies it had in force for plaintiffs.

In the spring of 1966, before the first loss, at plaintiffs' request, Jackson spent several hours going over their policies with them and their bookkeeper, explaining what was covered and what was not covered and the premiums involved.

On August 2, 1966, a week after the first loss and about nine days before the second, Jackson called on plaintiffs again, asking questions and filling out, as best he could, the forms furnished him by his underwriting department. At that time he explained that the premium rate for inland marine insurance was not set by the State and that he could not rate the coverage himself, but would have to get a rate from the underwriting department, and that the premium would be rather high. Jackson testified that between August 2 and the second loss he tried to get additional needed information from plaintiffs over telephone, but the information obtained was extremely vague, and that on August 10, 1966, he obtained final sales figures from one of the plaintiffs, which was, as far as he knew, the last information he needed, and that he would be able to quote them rates on the inland marine policy, both with and without fire and extended coverage; that he did not indicate when he would furnish these quotations because he had no idea how long it would be before the information would come to him from the underwriting department; that it would have been necessary to obtain plaintiffs' signatures on a final application if the prices quoted were acceptable and the plaintiffs still desired the coverage after learning of the cost; that he never did tell either of the plaintiffs that he would furnish them an inland marine policy, but merely said he would "furnish them a quote on it." He admitted that plaintiffs told him "to cover them," that they wanted coverage; that he got the needed information on August 10, the day before he went on vacation (which was also the day before the second loss), and that the underwriter he was furnishing this information to was also on vacation all that week, so that if he had gotten the information two or three days earlier it wouldn't have made any difference.

Plaintiffs admitted that they had not had any conversation about the cost of the coverage they desired, and that Jackson never stated to them that Liberty had agreed to furnish coverage on plaintiffs' locations in Dallas, Houston and San Antonio. When plaintiffs learned of the second loss, they inspected the premises and then went to Liberty's office to see if there was any coverage because they knew they had not received a policy.

Witnesses from Liberty's underwriting department testified that after the first loss they had recommended an inland marine policy because it, unlike a mere theft policy, would cover plaintiffs' merchandise while being transported from place to place and on display at various shows; that as of the time of the second loss the underwriting department had never received enough information to furnish a quotation on the cost

of the inland marine insurance, or to determine whether the company was willing to insure the risk at all.

## Opinion

■ By their first point of error on appeal, the plaintiffs say there is no legal basis for Liberty to recover a premium for a policy which it did not issue and would not have issued. They argue that since this was a suit for damages for failure to insure, and not a suit on a written or oral policy of insurance, there was no justification for deducting the premium of $377 which would have been earned had the insurance been issued. However, we are of the opinion that plaintiffs' recovery, if any, should be limited to the net amount they would have realized had the insurance been issued; i. e., the amount of the loss less the cost of the insurance. Their first point of error is overruled.

■ By their second point of error, they say there is no evidence to sustain the trial court's finding as to the amount of the premium set off against their recovery. One of the witnesses from Liberty's underwriting department, Billy M. Prestidge, testified that a burglary and theft policy on mercantile open stock carried an annual premium rate of $1,131. One-twelfth of that would be $94.25. The evidence was undisputed that Liberty cancelled all of the plaintiffs' policies approximately four months after plaintiffs' first conversations with Jackson following the July, 1966 loss. If this burglary and theft policy had been issued and cancelled four months later, the earned premium would be approximately four times $94.25, or $377. Therefore, we cannot say there is no evidence to support the court's finding and judgment in this respect, and plaintiffs' second point of error is overruled.

■ Under their third point of error, the plaintiffs complain of the failure of the trial court to include in their recovery the loss of $772.20 sustained at their warehouse

in July, 1966. We see no merit in this point because there is no evidence in the record of an agreement on the part of the defendants, or anything else to create a duty on their part, to insure plaintiffs against loss by theft or burglary. The defendants had not even been informed of the existence of the warehouse. The plaintiff Enochs testified that they had fire insurance and he assumed that fire and theft insurance went together automatically. This erroneous assumption on his part, of course, could not create a duty on the part of defendants to insure against theft. Therefore, we think the court was entirely correct in refusing to allow recovery for the first loss, and the third point of error is accordingly overruled.

The overruling of all of the plaintiffs' points of error would require an affirmance of their judgment of $1,085.79 except for the attack made thereon by the defendants in their cross-appeal, which we shall now discuss.

Under their first ten cross-points the defendants attack the judgment because there was no evidence to establish a duty on their part to insure plaintiffs against either of the losses in question, or to notify them of their refusal, inability, or delay in doing so. Defendants argue that there could have been no contract of insurance until an application therefor had been made and accepted and the minds of the parties met on the essential elements of such an insurance contract, pointing out that there is no evidence in the record that Jackson ever agreed or promised that he or Liberty would write the insurance to protect against the losses in question, and that even if Jackson had so agreed it was undisputed in the evidence that he had no authority to bind Liberty by such an agreement. We agree.

To establish a cause of action for damages for failure to insure, it was of course essential that plaintiffs first establish a duty on the part of defendants to insure. Since no such duty can be said to have been

imposed on defendants by law, it became necessary for plaintiffs to show that the defendants had expressly or impliedly agreed to insure them. Plaintiffs cannot discharge their burden of proving this essential element of their action by pleading and proving their own ignorance of insurance matters and merely that they "instructed" the agent to procure for them such insurance as they might need.

■ The several conversations between plaintiffs and Jackson after the first loss, and prior to the second loss, do no more than show a desire on the part of plaintiffs to be insured against further losses by theft, a suggestion by Jackson that an inland marine policy would probably be more suitable for them, as it would protect them against loss of their merchandise while in transit to and being exhibited at medical conventions, an acquiescence by plaintiffs to this suggestion, and the efforts of Jackson and the underwriting department of Liberty to obtain the necessary information from plaintiffs to determine the rate of premium and complete the application for plaintiffs' signature. They needed data concerning the volume of plaintiffs' sales at their three different retail outlets, the amounts of inventory at each of them, the nature of the merchandise at the various locations, whether such locations in the three cities were in a good or bad part of town, what "deductibles" were desired; i. e., what portions of the losses the plaintiffs would be willing to bear in order to obtain reduced premiums, the nature and extent of prior theft losses, the type and existence *vel non* of burglar alarm systems at the various locations, where the various exhibitions were held and the value of the merchandise plaintiffs would have there, as well as the means of transporting the same, and whether they would be left overnight or locked in a room; whether plaintiffs would want a one or three year policy; what limits of liability would be desired at the several locations to be insured; the limits of liability for transportation coverage, etc. Such an application might have been accept-

ed or rejected; there was no duty on the part of the defendants to accept it. The unfortunate circumstance of another burglary loss occurring while defendants were gathering this information cannot be said to create an insurance where none existed before the loss. Under general contract law, which is applicable to insurance contracts, there must be an offer and acceptance to evidence a complete agreement, "or no obligations arise." Republic Nat. Life Ins. Co. v. Hall, 149 Tex. 297, 232 S.W.2d 697, 699 (1950).

■ Plaintiffs do not contend that defendants spent an unreasonably long time in gathering the information. They do not allege negligence or unreasonable delay. Their complaint is that defendants breached a duty either to insure them or notify them of refusal or inability to insure or delay in doing so. Plaintiffs are bound to have known from the numerous visits and telephone conversations with Jackson that the writing of the insurance was being delayed, and they will not be heard to complain of lack of notice of such delay because they were fully aware of it. Defendants had not received sufficient information upon which to base a refusal, or to determine inability, to write the insurance when the second loss occurred. Under these circumstances we hold there was no duty to insure or notify.

The defendants' first ten cross-points are sustained.

Their cross-points Nos. 11 through 24 all relate to pleadings, special exceptions and the admissibility of certain evidence. In view of our holdings under the first ten cross-points, it is not necessary to consider or pass upon these additional points.

■ Cross-point No. 25 complains of the refusal of the trial court to make findings of fact and conclusions of law. We overrule this point because the findings and conclusions set out in the judgment were sufficient to support it, and defendants have not requested any additional findings.

Stahl v. Westerman, 250 S.W.2d 325, 326 (Tex.Civ.App., San Antonio 1952, no writ); Norris v. Vaughn, 278 S.W.2d 582 (Tex. Civ.App., Amarillo 1955, no writ).

The judgment of the trial court is reversed and here rendered that the plaintiffs take nothing.

Reversed and rendered.