TRACTEBEL ENERGY MARKETING, INC. and Tractebel Power, Inc., Appellants,

v.

E.I. DU PONT DE NEMOURS AND COMPANY, Appellee.

No. 14–02–00406–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Aug. 14, 2003.

Laura Rowe, Houston, for appellants.

Charles T. Miers, John M. Ribarits, Houston, for appellee.

Panel consists of Chief Justice BRISTER and Justices FOWLER and FROST.

## OPINION

SCOTT BRISTER, Chief Justice.

Tractebel Energy Marketing, Inc. ("TEMI") and Tractebel Power, Inc. ("TPI") appeal from an adverse judgment in their breach of contract action against E.I. DuPont de Nemours and Company. A jury found DuPont breached the contract and caused TPI damages of $1.2 million, but excused the breach due to commercial impracticability. However, the definition of impracticability given to the jury excluded two critical elements, neither of which was supported by any evidence at trial. Finding no evidence to support the only issue found in DuPont's favor, we reverse the judgment below and remand for judgment in accordance with the remainder of the jury's verdict.

TPI designs and builds power plants. EPA regulations require certain new sources of air emissions (like power plants) to offset anticipated increases in overall emissions by purchasing emission reduction credits from existing plants. Existing plants create these credits by installing better technology or shutting down operations. In connection with its plans to build a power plant in New England, TPI engaged TEMI (an affiliate in the commodity trading business) to find and purchase the credits it would need.

DuPont earned 7,649 tons per year of NOx emission credits in 1983 by reducing emissions from its Repauno Plant in New Jersey. New Jersey law provides that

future regulations can reduce or eliminate these credits at any time,[1] a fact confirmed in a letter to DuPont from the New Jersey Department of Environmental Protection confirming the credits:

> Should the regulation for an applicable criteria pollutant become more restrictive than that of the time of your reduction credit, the quantity banked will be discounted by the amount required by the new regulation.

In 1994, DuPont's credits were cut almost in half, with the NJDEP again issuing the same warning of potential future reductions.

TPI (through TEMI as its agent) contracted with DuPont to buy 1,000 tons of credits for $1 million on March 10, 1998.[2] Shortly thereafter, NJDEP revoked the credits, citing new regulations. Deprived of its credits, DuPont refused to perform. DuPont sued NJDEP for revoking the credits, and TPI[3] sued DuPont. DuPont later abandoned its suit; TPI has not.

At trial, a jury found a contract had been formed, DuPont had repudiated it, and TPI had incurred $1.2 million in damages.[4] The jury rejected DuPont's defenses that performance was excused by mutual mistake, unilateral mistake, or impossibility, but agreed with its defense that performance was excused due to commercial impracticability. On that basis, the trial court rendered judgment in DuPont's favor. TPI appeals, and DuPont cross-appeals.

### Impracticability in Texas

First, TPI argues commercial impracticability is not recognized as a defense in Texas except in the context of the sale of goods.[5] Though Texas courts rarely use that name, they have accepted the defensive doctrine under aliases.[6]

Section 261 of the Restatement (Second) of Contracts defines impracticability in the following terms:

> **§ 261. Discharge by Supervening Impracticability.**
>
> Where, after a contract is made, a party's performance is made impracticable without his fault by the occurrence of an event the non-occurrence of which was a basic assumption on which the contract was made, his duty to render that performance is discharged, unless the language or the circumstances indicate the contrary.[7]

---

**1.** *See* N.J. ADMIN. CODE tit. 7, § 27–18.8.

**2.** As discussed more fully below, DuPont challenges the jury's finding that a contract was made and that TEMI acted as agent for TPI.

**3.** The suit and this appeal were brought on behalf of both TPI and TEMI. As the latter purported to act only as agent for the former and claims no recovery in its own right, we refer to both by the principal's name.

**4.** The jury question defined damages as "[t]he difference, if any, between the market value of [the credits] at a commercially reasonable time after TEMI learned of the repudiation, and the [contract] price."

**5.** *See* TEX. BUS. & COM.CODE § 2.615 (excusing performance of contract to sell goods based on impracticability).

**6.** *See, e.g., Ramirez Co. v. Hous. Auth. of City of Houston,* 777 S.W.2d 167, 173 n. 11 (Tex. App.-Houston [14th Dist.] 1989, no writ) (recognizing impossibility of performance, commercial impracticability, and frustration of purpose as excuses for non-performance); *see also* Richard A. Posner & Andrew M. Rosenfield, *Impossibility and Related Doctrines in Contract Law: An Economic Analysis,* 6 J. LEGAL STUD. 83, 86 (1977) (stating no functional distinction exists among doctrines of impossibility, impracticability, and frustration of purpose).

**7.** RESTATEMENT (SECOND) OF CONTRACTS § 261 (1981).

In three following sections, the Restatement addresses the general contexts in which the defense has been accepted: (1) the death or incapacity of a person necessary for performance,[8] (2) the destruction or deterioration of a thing necessary for performance,[9] and (3) prevention by governmental regulation.[10]

■ Texas courts have excused performance in each of these situations (though not using the term impracticability).[11] And in its most recent pronouncement on the subject, the Supreme Court relied on sections 261 and 264 of the Restatement in setting out the proper elements of the defense.[12] Although the Supreme Court referred to the defense as "impossibility" rather than impracticability, it is clear the Court approved the substance of the Restatement sections regardless of the name applied to the defense.[13] Thus, we find the doctrine of commercial impracticability as defined in the Restatement does exist in Texas, and we overrule TPI's first issue.

■ In its second issue, TPI contends the trial court should have determined impracticability as a matter of law rather than submitting the question to the jury. The states appear to disagree on the point.[14] But in Texas, defenses to breach of contract are generally considered questions for the jury unless the facts are uncontested.[15] Here, the very existence of a contract was hotly disputed, as were most of the elements required by the Restatement to establish impracticability. Under these circumstances, the trial court

8. *Id.* § 262.

9. *Id.* § 263.

10. *Id.* § 264.

11. *See infra,* notes 21–23.

12. *See Centex Corp. v. Dalton,* 840 S.W.2d 952, 954 (Tex.1992).

13. *Id.* at 954; *see also Walden v. Affiliated Computer Servs., Inc.,* 97 S.W.3d 303, 325 (Tex.App.-Houston [14th Dist.] 2003, pet. filed) (citing *Centex* but finding no legal impediment to performance when order at issue had terminated prior to trial).

14. The Restatement says that the question of impracticability "is generally considered to be one of law rather than fact." RESTATEMENT (SECOND) OF CONTRACTS ch. 11, introductory note, p. 310 (1981). However, the very case cited by the Restatement in support of that position suggests it is a mixed question of law and fact. *See Mitchell v. Ceazan Tires, Ltd.,* 25 Cal.2d 45, 153 P.2d 53, 54 (1944) ("[impossibility] is a conclusion of law drawn by the court from the facts of a given case, and although the trial court found both as a finding of fact and as a conclusion of law that the defendant's business was ... 'impossible,' the

evidence does not establish that the sale of new tires was made illegal or impossible."). Some jurisdictions have viewed the question strictly as one of law. *See, e.g., Mortenson v. Scheer,* 957 P.2d 1302, 1305 (Wyo.1998); *T.S.I. Holdings, Inc. v. Jenkins,* 260 Kan. 703, 924 P.2d 1239, 1248 (1996). Others have viewed it as a mixed question of law and fact. *See, e.g., City of Boise v. Bench Sewer Dist.,* 116 Idaho 25, 773 P.2d 642, 646 (1989); *Cleasby v. Leo A. Daly Co.,* 221 Neb. 254, 376 N.W.2d 312, 318–19 (1985). The uniform or pattern jury charges in several additional states include instructions for impracticability. *See* 1 CAL. JURY INSTRUCTIONS—CIVIL § 10.81 (9th ed.); N.M. STAT. ANN., Uniform Jury Instructions—Civil No. 13–840; VERNON'S OKLA. FORMS 2D, Uniform Jury Instructions—Civil No. 23.37; 6A WASH. PRAC., Pattern Jury Instructions—Civil No. 302.09 (4th ed.).

15. *See, e.g., Hathaway v. Gen. Mills, Inc.,* 711 S.W.2d 227, 228–28 (Tex.1986) (holding issue of modification depends on the intent of the parties and is for the jury to determine); *James T. Taylor & Son, Inc. v. Arlington ISD,* 160 Tex. 617, 335 S.W.2d 371, 376 (Tex.1960) (holding unilateral mistake is question of fact for the jury unless the court can make the determination from undisputed evidence); *Chastain v. Cooper & Reed,* 152 Tex. 322, 257 S.W.2d 422, 424 (1953) (holding that absent

properly submitted the impracticability question to the jury.

### Impracticability and Basic Assumptions

In its remaining issues, TPI challenges the form of the trial court's jury question on impracticability, and the sufficiency of the evidence to support the defense. We review the former for an abuse of discretion;[16] we review the latter for any evidence supporting the verdict, considering it in a light that supports the judgment and disregarding all evidence and inferences to the contrary.[17]

■ Generally, impracticability excuses a party's breach of contract when the contract itself doesn't provide an escape clause and the doctrine's other requirements are satisfied. Because courts cannot simply rewrite the parties' contract, the excuse is limited to circumstances in which both parties held a basic (though unstated) assumption about the contract

that proves untrue. This "basic assumption" requirement is reflected in the Restatement,[18] the Uniform Commercial Code,[19] and federal common law.[20]

■ In the Texas cases recognizing the defense, the "basic assumption" of the parties is relatively obvious. In a contract for personal services, the death or incapacity of the person involved makes the contract impracticable for obvious reasons.[21] Similarly, a contract to lease or insure a building is rendered impracticable if the building is destroyed.[22] A change in the law that makes performance illegal also renders it impracticable.[23] In each of these circumstances, it takes little imagination to see that both contracting parties entertained a basic assumption about the contract that proved untrue.

■ In this case, DuPont clearly had its own credits in mind when entering the contract, but for this to be a basic assumption of the contract there must be evidence

an express agreement, novation is a question of fact).

16. *See Texas Dept. of Human Servs. v. E.B.*, 802 S.W.2d 647, 649 (Tex.1990).

17. *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 782 (Tex.2001).

18. RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. b; *see also Juarez v. Hamner*, 674 S.W.2d 856, 861 (Tex.App.-Tyler 1984, no writ).

19. *See* TEX. BUS. & COM.CODE § 2.615(a) (including "basic assumption" requirement in defining impracticability in the sale of goods); *see also Robberson Steel, Inc. v. J.D. Abrams, Inc.*, 582 S.W.2d 558, 560 (Tex.Civ.App.-El Paso 1979, no writ).

20. *See United States v. Winstar Corp.*, 518 U.S. 839, 904–05, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (including "basic assumption" requirement in applying impossibility doctrine to sovereign acts defense).

21. *See, e.g., Nutt v. Members Mut. Ins. Co.*, 474 S.W.2d 575, 578 (Tex.Civ.App.-Dallas 1971, writ ref'd n.r.e.) (excusing employer's duty to pay salary to deceased corporate officer); *Salter v. Jones*, 348 S.W.2d 381, 383 (Tex.Civ.App.-El Paso 1961, no writ) (holding illness excused performance of party to personal services contract).

22. *See, e.g., Erickson v. Rocco*, 433 S.W.2d 746, 751 (Tex.Civ.App.-Houston [14th Dist.] 1968, writ ref'd n.r.e.) (holding duty to keep insurance on house was extinguished when house burned to the ground and thus had no insurable value); *Senter v. Dixie Motor Coach Corp.*, 67 S.W.2d 345, 347 (Tex.Civ.App.-Dallas 1933) (excusing performance of lease agreement when building subject to lease was damaged by fire), *aff'd*, 128 Tex. 389, 97 S.W.2d 945 (Comm'n App.1936).

23. *See Centex*, 840 S.W.2d at 954–56; *see also* RESTATEMENT § 261 cmt. e (distinguishing between cases in which performance is excused because it is objectively impracticable ["the thing cannot be done"] and those in which it

that TPI did as well.[24] The contract here did not specify the source or ownership of the credits being sold. Although parties may understand a specific thing is needed for performance based on prior dealings,[25] there were no such dealings here.

Instead, the evidence indicates a broker made the initial contact between the parties, but to protect his own position, did not disclose to either the identity of the other until a deal was struck.[26] Thus, TPI did not even know it was contracting with DuPont until the agreement was made, and could not have understood that continued validity of the Repauno credits was a basic assumption of the agreement.

 DuPont contends the broker was acting as TPI's agent in the transaction, so his knowledge that DuPont was selling its own credits must be attributed to TPI. But this is not an invariable rule, as this Court has previously held:

If a broker, under his contract with his principal, is charged with no responsibility and is not obligated to exercise any discretion, but his duty consists merely of bringing the parties together so that, between themselves, they may negotiate a sale, and the sale is made in that manner, the broker is considered a mere "middleman" and is not necessarily the "agent" of either party.[27]

There are good reasons here not to attribute the broker's knowledge about DuPont to TPI, as it is undisputed the broker kept the parties' identities confidential to protect his own position in the negotiations.

 But even assuming TPI knew DuPont was selling its own credits, this does not mean TPI understood that to be a basic assumption of the contract. According to the Restatement, the defense of impracticability does not apply when both parties *know* of the intended source if it is not a *basic assumption* of both parties that there will be no contract if that source

is not excused because it is merely subjectively impracticable ["I cannot do it"] ).

**24.** RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. b.

**25.** *Id.* § 263 cmt. b & illus. 7 & 8.

**26.** A transcript of the following telephone conversation between representatives of the broker, DuPont, and TEMI was admitted at trial:

Broker: Okay. I've got the buyer and seller on the line. I would like to outline the business terms of this transaction.
DuPont: Okay.
Broker: And I'm just going to read through this real quickly. If you have any questions, please stop me. A private NOX emission reduction credit transaction for permanent overcontrol New Jersey ERCs (oxides of nitrogen). The quantity concerned is 1000 tons per year of New Jersey Permanent Overcontrol credits. The trading price is $1000 per ton. The uh ... there are some conditions precedent. The seller would like seven business days to approve with their External

Affairs Department the name of the purchaser. The purchaser would like seven business days after the date of which the seller approves the buyer ... after the seller agrees to take the buyer's name, to uh ... receive final Board approval and with that, we would do a simple straightforward transaction. We can confirm this by the end of the day. Are there any questions?
....
Broker: All right.... [S]eller, please state your name and company name for the tape.
DuPont: Katherine H. Stone, DuPont Company.
Broker: All right. Thank you very much. Buyer, please state your name and company name for the tape.
TEMI: Robert Wilson, Tractebel Energy Marketing, Inc.
Broker: All right. Thank you very much. This deal is closed....

**27.** *Rauscher Pierce Refsnes, Inc. v. Great Southwest Sav., F.A.*, 923 S.W.2d 112, 115 (Tex.App.-Houston [14th Dist.] 1996, no writ).

fails. This point is repeated in several illustrations:

- a seller's knowledge of a buyer's intended source of funds is not a basic assumption of the contract unless the seller understands there will be no sale if that source fails.[28]

- a farmer's agreement to sell milk under a contract that does not specify the source is not discharged if the farmer's herd is subsequently destroyed due to disease.[29]

- a manufacturer's contract to sell a product it makes is not discharged by the destruction of its factory so long as product meeting the contract is available elsewhere on the market.[30]

In each case, one party's assumption about the source of supply—and the other party's knowledge of that assumption—is not enough to excuse performance if alternative sources of supply are still available to fulfill the contract.

In this case, credits from another source would have fulfilled the terms of the contract, and would have served TPI's purposes just as well.[31] There is no evidence TPI contracted on the assumption that DuPont's credits *and only those credits* were the subject of the contract.[32]

■ It is not surprising that the jury reached a contrary conclusion, because the instruction they received did not include this basic-assumption requirement.[33] Generally, when a portion of the Restatement has been adopted by Texas courts, a jury question must incorporate the elements required by the Restatement.[34] Both parties pointed out the omission and objected to it; the record does not reflect why this critical element was excluded.

■ Because TPI objected to the charge, we measure the legal sufficiency of the evidence by the charge the trial court

---

DuPont did not obtain a jury finding that the broker was TPI's agent.

**28.** RESTATEMENT (SECOND) OF CONTRACTS § 261 illus. 2.

**29.** *Id.* illus 12.

**30.** *Id.* § 263 illus. 1.

**31.** One of DuPont's lead negotiators on the agreement, Tyrone Chichester, testified that credits from a source other than the Repauno facility would have fulfilled the contract. DuPont's argument that other sources were not available is discussed below in the "Reasonable Efforts" section.

**32.** RESTATEMENT (SECOND) OF CONTRACTS § 263 cmt. a; *see also United Sales Co. v. Curtis Peanut Co.*, 302 S.W.2d 763, 766 (Tex.Civ. App.-Dallas 1957, writ ref'd n.r.e.) ("It is not enough to show merely that because of events occurring since the making of the contract it has become impossible to obtain a commodity contracted for from a source contemplated by the parties, where the contract does not speci-

fy that the commodity is to be obtained there, even though it would have been more expensive to obtain it elsewhere.").

**33.** Question 6 in the charge read:

Was DuPont's repudiation of the agreement excused due to commercial impracticability? Impracticability occurs when: (1) the cost of performing the agreement has become totally unreasonable or impracticable because of an occurrence that was beyond the control of the parties; and (2) the parties could not reasonably foresee the occurrence when they made the agreement.
Performance may be impracticable because of extreme and unreasonable difficulty, expense, injury, or loss to one of the parties will be involved [sic]. Increased cost alone does not excuse performance of an agreement unless the rise in costs is due to some unforeseen contingency which alters the essential nature of the performance of the agreement.

**34.** *See St. Joseph Hosp. v. Wolff,* 94 S.W.3d 513, 530 (Tex.2003) (finding trial court erred in submitting definition that did not track

*should have* given.[35] Applying that standard, we hold there is no evidence the continued existence of DuPont's credits was a basic assumption of both parties in making this agreement, and the trial court erred in submitting impracticability to the jury.[36]

### Impracticability and Reasonable Efforts

■ The basic-assumption element was not the only one omitted from the definition of impracticability given to the jury. The Restatement also provides a party claiming the defense must use reasonable efforts to surmount the obstacle to performance:

> [A] party is expected to use reasonable efforts to surmount obstacles to performance ..., and a performance is impracticable only if it is so in spite of such efforts.[37]

An illustration makes clear that a party blaming governmental regulations for nonperformance must pursue all remedies reasonably available to avoid them:

> A contracts to construct and lease to B a gasoline service station. A valid zoning ordinance is subsequently enacted forbidding the construction of such a station but permitting variances in appropriate cases. [A] makes no effort to obtain a variance, although variances have been granted in similar cases, and fails to construct the station. A's performance has not been made impracticable. A's duty to construct is not dis-

charged, and A is liable to B for breach of contract.[38]

TPI argues DuPont failed to use reasonable efforts by failing to pursue an appeal of the NJDEP decision to cancel its credits. The NJDEP based its cancellation on regulations requiring DuPont to lower emissions effective as of June 30, 1998 (at the earliest) and June 30, 1999 (at the latest). DuPont submitted a new emissions control plan that was adopted on August 15, 1997. On March 30, 1998, the NJDEP decided the credits were eliminated as of the adoption date of DuPont's plan (seven months before the credit sale) instead of the effective date of the regulations (three months after the sale).

Several DuPont witnesses (including a former NJDEP executive) testified the cancellation was *improper and unprecedented*, that cancellation of credits before the effective date of a new and more restrictive regulation had never occurred before or since. Indeed, DuPont filed a lawsuit challenging the cancellation, but later voluntarily dismissed it. DuPont witnesses explained the appeal was dismissed because DuPont did not believe it could win, at least not in time to effectuate the contract. When pressed for the basis of this opinion, DuPont claimed the attorney-client privilege.

■ The Restatement recognizes that even an invalid government regulation may make performance impracticable, but again requires a party seeking discharge to use reasonable efforts to avoid its application.[39] Here, DuPont presented *opin-*

Restatement language previously adopted by court).

35. *Id.* at 530.

36. Because no issue should have been submitted, the error in the charge is moot except as it affects our review of legal sufficiency. *Id.* at 530, 534.

37. RESTATEMENT (SECOND) OF CONTRACTS § 261 cmt. d; *see also id.* § 264 cmt. b, *Galveston, H. & S.A. Ry. v. Karrer*, 109 S.W. 440, 441 (Tex.Civ.App.-San Antonio 1908, no writ).

38. RESTATEMENT (SECOND) OF CONTRACTS § 261 illus. 11.

39. *Id.* § 264 cmt. b.

*ions* that its efforts were reasonable, but no *evidence* to that effect. Both at trial and on appeal, DuPont presented neither evidence nor argument that it would have lost on the merits; to the contrary, it has continued to insist the NJDEP acted improperly. Nor is there any evidence or explanation why DuPont could not have obtained an order approving the credit sale retroactive to the date of denial.[40]

DuPont's explanation for the voluntary dismissal of its appeal cannot be enough-if all that is required to show reasonable effort is evidence that "on advice of counsel we decided to do nothing," then no effort is required beyond a conversation with an attorney. DuPont was not necessarily required to waive its attorney-client privilege,[41] but it was required to explain why abandoning the appeal was a reasonable thing to do. As it never did so, we find there is no evidence DuPont took reasonable measures to challenge the NJDEP revocation, and thus again cannot rely on the doctrine of impracticability.

### The Agreement

 In its first cross-point, Du-Pont argues there was no evidence Du-Pont and TPI had a contract because certain conditions precedent went unfulfilled. A condition precedent is an event that must happen before a right accrues to enforce performance.[42] The existence of a condition precedent depends on the parties' intention as expressed in their contract,[43] using its "plain grammatical meaning unless to do so would defeat the parties' intent."[44] Conditions precedent are generally disfavored in Texas.[45]

The jury found a contract was reached in a telephone conference a broker arranged between DuPont and TEMI (TPI's agent) on May 10, 1998, and confirmed in writing by fax later that day. DuPont points to the following portions of the confirmation the broker faxed to each party as the basis for its allegation of unfulfilled conditions:

> Conditions: "Dupont has seven (7) business days to approve Tractebel Energy Marketing, Inc. with Dupont's external affairs department. Once approval has been given by Dupont, Tractebel Energy Marketing has seven (7) business days to approve the transaction with Tractebel Energy

40. Because the issue is not before us, we mean to imply nothing about the validity of such an order. We merely point out that there is no evidence showing such an order could not have been obtained, and thus nothing to support DuPont's claim that its dismissal was reasonable.

41. Because neither party asserts nor briefs the issue, we do not reach the question whether DuPont waived its attorney-client privilege by relying on advice of counsel to support its affirmative defense of impracticability. *See Republic Ins. Co. v. Davis*, 856 S.W.2d 158, 163 (Tex.1993) (barring offensive use of attorney-client privilege by parties seeking affirmative relief); *cf. Valero Energy Corp. v. M.W. Kellogg Constr. Co.*, 866 S.W.2d 252, 256 (Tex.App.-Corpus Christi 1993, writ denied) (barring offensive use of attorney-

client privilege by party asserting an affirmative defense).

42. *Centex*, 840 S.W.2d at 956.

43. *Criswell v. European Crossroads Shopping Ctr.*, 792 S.W.2d 945, 948 (Tex.1990).

44. *DeWitt County Elec. Co-op. v. Parks*, 1 S.W.3d 96, 101 (Tex.1999).

45. In construing a contract, forfeiture by finding a condition precedent is to be avoided when another reasonable reading of the contract is possible.... When the intent of the parties is doubtful or when a condition would impose an absurd or impossible result, the agreement will be interpreted as creating a covenant rather than a condition....

Marketing, Inc.'s board of directors."[46]

Delivery: Upon execution of a NOx ERC sales agreement, Seller shall present a letter requesting ERC transfer to the New Jersey Department of Environmental Protection (NJDEP) with a copy to the Buyer. Upon the earlier of (i) entry of a record in the NJDEP ERC Registry that the purchased ERCs have been committed to or used by Buyer, or (ii) receipt of written confirmation from the NJDEP that interest in purchased ERCs has been transferred to Buyer, Buyer shall forward payment in full to Seller within three (3) business days.

Regarding the Conditions section, DuPont concedes its external affairs department approved TEMI, and it is undisputed TEMI's board of directors approved the transaction as well. There is no mention in this section of any other condition.

 In the Delivery section, it is clear the matters therein are payment and delivery terms, and not conditions precedent. First, that is what the section's title says they are.[47] Second, the last sentence does not condition the sale on NJDEP approval, but merely provides when TEMI had to pay for the credits. Third,

though the remaining sentence indicates the parties intended to sign a written sales agreement, an intention to sign a formal contract later does not mean there is no contract.[48] If the parties intend to be bound, their intention to sign a more formal document is not a condition precedent to their enforcement.[49] Thus, when it is disputed whether the parties intended to be bound by the initial agreement, the question is one of fact for the jury.[50]

Here, the issue of intent to be bound was hotly contested, and reasonable minds could find either way. Thus, the trial court did not err in asking the jury whether the parties reached a binding agreement, and there is sufficient evidence to support its affirmative answer.

### Agency

 In its second cross-point, DuPont challenges the jury's finding that TEMI acted as TPI's agent in contracting with DuPont, and argues TPI has no standing as a matter of law. DuPont points to evidence of disharmony between TPI and TEMI,[51] and argues neither could have been the agent of the other because neither was acting like a fiduciary. But the existence of a fiduciary relationship is

---

*Criswell*, 792 S.W.2d at 948.

**46.** The transcript of the telephone conference between the broker and the parties only mentions these same two conditions precedent. *See supra*, note 26.

**47.** DuPont contends conditions precedent can occur anywhere in an agreement, citing *South Texas Medical Clinics, P.A. v. Phycor, Inc.*, 113 F.Supp.2d 1094, 1099 (S.D.Tex.2000) (finding conditions precedent language existed in "accounts receivable" section of contract). However, even assuming that to be the case, the location of the language within a contract may certainly be relevant to its construction. *See Criswell.*, 792 S.W.2d at 948 (stating that in determining whether a condition precedent

exists, intention of parties must be ascertained from looking at entire agreement).

**48.** *Scott v. Ingle Bros. Pac., Inc.*, 489 S.W.2d 554, 556 (Tex.1972); *Murphy v. Seabarge, Ltd.*, 868 S.W.2d 929, 933 (Tex.App.-Houston [14th Dist.] 1994, writ denied).

**49.** *Foreca, S.A. v. GRD Dev. Co.*, 758 S.W.2d 744, 746 (Tex.1988).

**50.** *Id.; Murphy*, 868 S.W.2d at 933.

**51.** DuPont points to evidence suggesting TEMI cared more about its interest than those of TPI and that TEMI only looked at circumstances from its perspective rather than TPI's. DuPont does not argue that either entity owed it a fiduciary duty.

a *result* of an agency relationship, not an *element* of it.[52] Evidence that an agent may have breached its fiduciary duty to its principal does not prove no agency ever existed.

Additionally, Dupont argues there was no documentation of any agency agreement, and that TPI could not control TEMI because the two were "on the same level" within the Tractebel family of companies.[53] First, an agency agreement does not have to be in writing.[54] Second, a company's status in a corporate hierarchy does not limit its power to agree to act as an agent; clearly, a parent corporation could agree to serve for some purposes as an agent of one of its lowly subsidiaries.[55]

At trial, representatives of both TPI and TEMI testified the latter was acting as agent for the former. A copy of an e-mail from TEMI to TPI was admitted reporting the status of negotiations and requesting "more definite instructions" regarding the DuPont deal. It was undisputed TPI was in the business of building power plants that could use the credits, while TEMI was in the business of trading commodities for others on commission. Finally, TPI was to pay TEMI a commission had the sale been completed. In sum, DuPont did not establish as a matter of law that no agency relationship existed, and the record contains more than a scintilla of evidence to support the jury's finding to the contrary.[56]

### Impossibility

In its final cross-point, DuPont argues the evidence conclusively established that performance under the parties' agreement was impossible due to the NJDEP revocation, and the jury's answer to the contrary was improper.[57] In *Centex Corp. v. Dalton,* the Supreme Court excused performance of a contract to pay a finder's fee when an agency ruling made it illegal to pay such fees.[58] But here, while the NJDEP revocation may have made it impossible for DuPont to sell *its own* credits (assuming no successful appeal of that order), the NJDEP did not make it illegal for DuPont to sell *any other* credits to TPI. DuPont could have attempted other avenues of performance, including creating new credits or buying credits from another source to fulfill its obligation. Though DuPont argues on appeal that it was impossible to do so, that evidence was disputed at

52. *See, e.g., O'Bryant v. Century 21 S. Cent. States, Inc.,* 899 S.W.2d 270, 271 (Tex.App.-Houston [14th Dist.] 1995, no pet.).

53. DuPont argues TPI had no right to control the "means and details" of TEMI's purchase of credits, but the charge instructed only that a principal had the right to "control" an agent. As DuPont did not object to the instruction, we measure the evidence against the charge as submitted. *See Wolff,* 94 S.W.3d at 530.

54. *Rollingwood Trust No. 10 v. Schuhmann,* 984 S.W.2d 312, 316 (Tex.App.-Austin 1998, no pet.).

55. RESTATEMENT (SECOND) OF AGENCY § 14M cmt. a (1958).

56. *See Lee Lewis Constr.,* 70 S.W.3d at 782.

57. The jury answered the following question in the negative:

Was DuPont's repudiation of the agreement excused due to impossibility?
Impossibility occurs when: (1) the agreement has become impossible to perform because of an occurrence that was beyond the control of the parties; and (2) the parties could not reasonably foresee the occurrence when they made the agreement. "Impossible" means that neither DuPont nor anyone else could have performed the agreement.

58. *See Centex,* 840 S.W.2d at 956.

trial.[59] Accordingly, DuPont did not establish impossibility as a matter of law.

### Conclusion

In sum, we find there was sufficient evidence to support every one of the jury's answers, with the exception of the impracticability question that omitted crucial elements. Finding no evidence to support the only issue the jury found in DuPont's favor, we reverse the judgment below and remand for judgment in accordance with the remainder of the jury's verdict. On remand, the trial court is instructed to consider TPI's request for attorney's fees and costs, and to render a final judgment for TPI in accordance with this opinion.

---

59. In its brief, DuPont concedes the existence of almost 1,500 other credits banked with the NJDEP. DuPont presented evidence it could not purchase those credits, but there was conflicting evidence about how hard it had tried.