# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-03-00740-CV

Tom Dyke and Sibyl Dyke, Appellants

v.

Don Jackson and Velna Jackson d/b/a Prophet Investments, Appellees

FROM THE DISTRICT COURT OF TRAVIS COUNTY, 345TH JUDICIAL DISTRICT
NO. GN300334, HONORABLE C. W. DUNCAN, JR., JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

Appellants Tom Dyke and Sibyl Dyke ("the Dykes") leased a house from owners and appellees Don Jackson and Velna Jackson d/b/a Prophet Investments ("the Jacksons"). Curtis Gallaher, Sibyl Dyke's brother, was injured at the house when a non-tempered glass panel shattered and cut his wrist. Gallaher sued the Jacksons, alleging that their use of non-tempered glass was negligent, that he was an invitee and thus owed a duty by the Jacksons, and that he was a third-party beneficiary of the lease agreement between the Dykes and the Jacksons. The Jacksons filed a third-party petition against the Dykes, alleging that the Dykes, as tenants in control of the property, were liable for any injuries. The Jacksons alleged that the lease required the Dykes to obtain liability insurance naming the Jacksons as additional insureds and that the Dykes failed to obtain such insurance. The Jacksons further alleged that the lease agreement included an indemnification provision under which the Dykes agreed to indemnify the Jacksons from all claims arising out of

loss, damage, or injury arising from the condition of the house or the Dykes' use of the house during the lease term. After Gallaher and the Jacksons reached a settlement agreement, Gallaher's claims against the Jacksons were severed from the Jacksons' claims against the Dykes and dismissed.

The Jacksons moved for summary judgment, arguing that the Dykes breached the lease by failing to obtain the required insurance and by refusing to indemnify the Jacksons against Gallaher's claims. The Dykes moved for summary judgment against the Jacksons, arguing that the indemnification clause was unenforceable because it did not satisfy the "fair notice" requirements, the Dykes could not obtain insurance for the Jacksons, and the Dykes had no obligation to provide insurance at the time Gallaher was injured. The trial court denied the Dykes' motion and granted the Jacksons' motion and then signed a final judgment awarding the Jacksons $121,000 from the Dykes, plus interest and appellate attorney's fees. The Dykes appeal, arguing in six issues that the indemnity clause was unenforceable, the Dykes did not have actual notice of the indemnity clause so as to comply with fair notice requirements, there was a fact issue as to impossibility, the insurance requirement was not yet in effect when Gallaher was injured, and the settlement with Gallaher was not reasonable, prudent, and made in good faith. We affirm the trial court's judgment.

## Standard of Review

The standards used in reviewing the grant of summary judgment are well established. When both parties move for summary judgment and the trial court grants one motion and denies the other, we will review the evidence presented by both sides and determine all questions presented, rendering the judgment that the trial court should have rendered. *Cornyn v. Universe Life Ins. Co.*, 988 S.W.2d 376, 378 (Tex. App.—Austin 1999, pet. denied). Summary judgment is proper if one

party establishes that there are no issues of material fact and that he or she is entitled to judgment as a matter of law. *Id.* We take as true evidence favorable to the non-movant and indulge all inferences and resolve any doubts in the non-movant's favor. *Id.* If the trial court does not specify the ground or grounds on which summary judgment is granted, we will consider all grounds advanced by the parties and will sustain the summary judgment if any of the theories is meritorious. *Rogers v. Ricane Enters., Inc.*, 772 S.W.2d 76, 79 (Tex. 1989).

### Insurance Issues

In two issues, the Dykes argue that the lease provision requiring them to obtain insurance is unenforceable. They argue that they raised a fact question as to whether the provision requiring them to procure insurance that would cover the Jacksons was impossible to satisfy. They further argue that the provision was not in effect at the time of Gallaher's injury because the Dykes had not yet "moved in" to the house.

The Jacksons' motion for summary judgment asserted that the Dykes breached the lease contract by failing to obtain insurance. In support of this argument, the Jacksons pointed to the language of the lease and Mr. Jackson's affidavit. The lease provided that the Jacksons "agree[d] to secure a tenants [sic] liability policy with minimum limits of $300,000 and $20,000 for liability and property damage respectively. [The Jacksons] shall be named as an additional insured on this policy. This policy shall be effective and sent to the [Jacksons] before any move in can occur." In his affidavit, Mr. Jackson averred that the two earlier tenants had obtained the required insurance and never informed the Jacksons that they had any difficulty in obtaining that insurance. He further averred that he had no reason to believe that the Dykes had not obtained insurance and would not

3

have leased to them if he had known that they had not obtained or would not obtain the insurance. The Jacksons also attached an affidavit by Jerry Tolar, who assists the Jacksons with the leasing and management of their real estate, in which Tolar averred that two earlier tenants had obtained the required insurance through Nationwide Insurance Company. He also averred that on April 15, 2000, he met with the Dykes to discuss the lease and that Mr. Dyke "assured me that he had . . . already contacted his insurance agent and had already added [the Jacksons] as an additional insured on their tenant's liability insurance policy."

By showing that the Dykes contracted to obtain the insurance but failed to do so, the Jacksons established their breach of contract claim as a matter of law. The Jacksons further showed that prior tenants had procured the required insurance. To defeat summary judgment, the Dykes had to raise a fact issue regarding their affirmative defense of impossibility.[1] *See Walden v. Affiliated Computer Servs., Inc.*, 97 S.W.3d 303, 324-25 (Tex. App.—Houston [14th Dist.] 2003, pet. denied).

Impossibility occurs if performance becomes impracticable or if the agreement's performance is frustrated by an event the non-occurrence of which was a basic assumption under which the contract was made. Restatement (Second) of Contracts §§ 261-266 (1981); *see Tractebel*

---

[1] The doctrine of impossibility is sometimes referred to as "impracticability." *Tractebel Energy Marketing, Inc. v. E.I. Du Pont De Nemours & Co.*, 118 S.W.3d 60, 64-65 & n.6 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Impossibility is defined as "[t]hat which, in the constitution and course of nature or the law, no person can do or perform." Black's Law Dictionary 755 (6th ed. 1990). "Impossibility of performance of contract" is defined as a "doctrine under which a party to a contract is relieved of his or her duty to perform when performance has become impossible or totally impracticable (through no fault of the party)." *Id*. The definition goes on to note that an action may be legally impossible if it is impracticable, meaning "when it can only be done at an excessive and unreasonable cost." *Id*.; *see also* Restatement (Second) of Contracts § 261, cmt. d (1981) ("'impracticability' means more than 'impracticality'").

4

*Energy Marketing, Inc. v. E.I. Du Pont De Nemours & Co.*, 118 S.W.3d 60, 64 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). Impossibility can be present at the time an agreement is made or can occur after an agreement has been made. *See Centex Corp. v. Dalton*, 840 S.W.2d 952, 954 (Tex. 1992); Restatement (Second) of Contracts §§ 265-266. A governmental regulation may make performance impracticable or impossible. Restatement (Second) of Contracts § 264 (1981). A party claiming impossibility must show it used reasonable efforts to attempt to avoid the obstacle to performance. *Tractebel Energy*, 118 S.W.3d at 69 (citing Restatement (Second) of Contracts § 261, cmt. d). A contractual obligation is not impossible simply because performance is more expensive or difficult than anticipated. *Huffines v. Swor Sand & Gravel Co.*, 750 S.W.2d 38, 40 (Tex. App.—Fort Worth 1988, no writ); Restatement (Second) of Contracts § 261, cmt. d ("mere change in the degree of difficulty or expense . . ., unless well beyond the normal range, does not amount to impracticability"); *see Tractebel*, 118 S.W.3d at 64-65.

Mr. Dyke testified in a deposition that he asked his insurance company to add the Jacksons to his homeowner's insurance on April 15. He assumed the insurance was in place until he was informed in June that he could not add the Jacksons to that particular policy. He was told, "You can do this on a commercial lease, but you can't do it on a residential lease" and that "the State didn't allow it." Mr. Dyke's insurance company gave him the names of two people at the Texas Department of Insurance, and he contacted them about the issue in August 2000. The Dykes produced a letter, dated August 15, 2000, from the Texas Department of Insurance, stating that a homeowner's insurance policy "is not intended to assume any liability for a landlord" and that the landlord should instead arrange for coverage from their own homeowner's or by a separate liability

policy on the rental property. The letter states that while coverage for a landlord "is not eligible for HO-301,[2] and not in accordance with the [Texas Personal Lines] Manual,[3] any company having issued a policy as such would have to abide by the policy contract." Although Mr. Dyke was aware that earlier tenants were able to get the required insurance, he did not ask whether he could add the Jacksons as additional insureds on a "tenants policy," did not inquire into "surplus lines coverage," and did not recall explaining that he was using the house as an office.

Assuming that the Dykes properly pleaded and presented the affirmative defense of impossibility, and assuming that the letter from the Department of Insurance established that the Dykes could not add the Jacksons to their existing homeowner's policy, the Dykes still did not raise a fact question as to whether performance of the insurance requirement was in fact impossible.

The Jacksons established both the existence of the insurance requirement and that other tenants had obtained insurance in the past. The Dykes raised a fact issue only as to one possible means to obtain the required insurance. The Dykes did not show that they made any effort to obtain the required insurance beyond their own homeowner's policy. They did not establish that they could not obtain insurance, for instance, through a commercial policy or a general liability policy. The Dykes did not show that they inquired as to coverage with any other insurance company, such as the one used by the Jacksons' past tenants. The letter from the Department of Insurance did

---

[2] HO-301 is an endorsement adding additional insureds to a Texas homeowner's policy. The letter describes the Dykes' inquiry as asking whether the HO-301 may be used to "provid[e] liability coverage to a landlord" and says that such coverage "is not an eligible exposure for the additional insured endorsement."

[3] The manual "outlines the writing rules for residential property policies in Texas" and "includes the eligibility rules for various situations in which the HO-301 may be used."

not establish that the Dykes were unable to obtain coverage on behalf of the Jacksons, only at most that they could not obtain coverage under one specific kind of policy. Thus, the Dykes did not raise a question of fact on the impossibility of obtaining insurance and avoiding a breach of the lease contract. The trial court did not err in granting summary judgment on the issue of impossibility.

The Dykes also asserted that their duty to provide insurance coverage for the Jacksons had not been triggered at the time of Gallaher's injury because they had not yet "moved in" to the house. They argue that because they had not moved their belongings into the house or begun residing in the house, they had not "moved in" under the lease and were not yet obligated to provide insurance coverage for the Jacksons. We disagree.

The lease was signed by the parties in mid-April 2000, and the Dykes paid rent for the period of April 15 through May 15. The lease requires the Dykes to obtain insurance covering the Jacksons before "move in" may occur. On May 6, the day Gallaher was injured, Gallaher was at the house helping his brother-in-law install a new gas cooktop. In exchange, Mr. Dyke paid Gallaher $100. The Dykes and Gallaher had removed an old electrical cooktop and installed the new one, hiring a plumber to prepare a gas connection, and Gallaher was going to turn the power back on when he walked into one of the glass panels and was injured. The Dykes replaced the electrical cooktop, which worked, because the old one was dirty and Mrs. Dyke preferred a gas unit. Mr. Dyke testified that in late April he told Tolar what he wanted to do, and Tolar said he should go ahead, but he never made a written request for the change to Tolar or the Jacksons.[4]

---

[4] Tolar stated in his affidavit that the Dykes never asked and he never gave permission for the replacement of the cooktop.

Generally when two parties enter into a lease contract and a lease term begins, the "lessor relinquishes possession or occupancy of the premises to the lessee." *Johnson County Sheriff's Posse, Inc. v. Endsley*, 926 S.W.2d 284, 285 (Tex. 1996); *see also Prestwood v. Taylor*, 728 S.W.2d 455, 460 (Tex. App.—Austin 1987, writ ref'd n.r.e.) (landlord, "by her lease to the tenant, transferred to him the right of possession and he entered into actual occupation of the land, for an extended period, with an intent to exercise the right of control given him in the lease contract"). In this case, the Jacksons relinquished control to the Dykes as of April 15. The Dykes pulled up carpet, had a plumber install a gas line for the new cooktop, removed the electrical cooktop, and installed the gas cooktop. Although the Dykes may not have moved all of their possessions into the house and may not yet have been residing in the house, they clearly exercised control and possession over the house. Under the Dykes' strained interpretation, a tenant could exercise control over the property, making changes, inviting friends over, and otherwise using the house, but as long as he did not move his furniture into the house or sleep in the house regularly, he could escape the requirement to provide insurance coverage under the lease. Further, the Dykes seem to have understood the lease to require insurance from the beginning of their control over the premises, as evidenced by Mr. Dyke's April 15 phone call to his insurance agent requesting insurance coverage for the Jacksons. By buying and installing the new appliance, the Dykes had indeed begun moving their belongings into the house.

The Jacksons showed as a matter of law that the Dykes were contractually obligated to obtain insurance and breached that obligation. The Dykes did not raise a fact question as to whether it was impossible to obtain the required insurance or as to whether the insurance provision

8

was in effect at the time of Gallaher's injury. Therefore, the trial court did not err in granting summary judgment in favor of the Jacksons.

**Was the Settlement Reasonable?**

Under the settlement, the Jacksons agreed to pay Gallaher $45,000 to settle the claims for which he originally sought $300,000 in damages. In defending and eventually settling Gallaher's suit, as well as prosecuting their suit against the Dykes through summary judgment, the Jacksons incurred $76,000 in attorney's fees. The Jacksons sought and were awarded $121,000 from the Dykes. The Dykes argue that the Jacksons did not prove that their settlement with Gallaher was reasonable, prudent, and made in good faith. They argue primarily from an indemnification standpoint. *See H.S.M. Acquisitions, Inc. v. West*, 917 S.W.2d 872, 879 (Tex. App.—Corpus Christi 1996, writ denied) ("For a settling indemnitee to recover an amount of the settlement from its indemnitor, the indemnitee must show its potential liability to a claimant and that the settlement was reasonable, prudent, and made in good faith under the circumstances."). The Jacksons, however, argue that they were not required to satisfy the reasonableness element of indemnification damages and instead were entitled to breach-of-contract damages.[5]

If a party voluntarily agrees to provide insurance coverage for another's property, he undertakes a duty similar to that of an insurance agent. *Colonial Sav. Ass'n v. Taylor*, 544 S.W.2d

---

[5] Prevailing plaintiffs in a breach-of-contract action may recover actual damages for losses that are "the natural, probable, and foreseeable consequence of the defendant's conduct." *Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981).

116, 119-20 (Tex. 1976). An insurance agent who agrees to procure insurance for another has a legal duty to use reasonable diligence to obtain the insurance and if he cannot, to notify the principal of his inability to do so. *May v. United Servs. Ass'n of Am.*, 844 S.W.2d 666, 669 (Tex. 1992); *see Stinson v. Cravens, Dargan & Co.*, 579 S.W.2d 298, 299-300 (Tex. Civ. App.—Dallas 1979, no writ); *Burroughs v. Bunch*, 210 S.W.2d 211 (Tex. Civ. App.—El Paso 1948, writ ref'd). The proper measure of damages for a failure to obtain insurance is the amount that would have been paid under the insurance policy if it had been obtained. *Diamond v. Duncan*, 177 S.W. 955, 956 (Tex. 1915); *Taylor v. Republic Grocery*, 483 S.W.2d 293, 296 (Tex. Civ. App.—El Paso 1972, no writ); *Wallis v. Liberty Mut. Ins. Co.*, 465 S.W.2d 422, 425 (Tex. Civ. App.—Dallas 1971, writ ref'd n.r.e.).

The Dykes were contractually obligated to obtain insurance coverage to benefit the Jacksons, but failed to do so and never notified the Jacksons of the failure. The Jacksons, then, were entitled to damages and attorney's fees incurred in defending and eventually settling Gallaher's suit, which otherwise presumably would have been covered by the required insurance. *See Mead v. Johnson Group, Inc.*, 615 S.W.2d 685, 687 (Tex. 1981) (breach-of-contract damages compensate for natural, probable, and foreseeable consequences of breach). The Jacksons diligently opposed Gallaher's suit for more than a year before settling the suit for about 15% of the damages Gallaher originally sought. Unless the Dykes raised a question of fact as to whether the settlement or the attorney's fees were unreasonable or incurred in bad faith, the trial court did not err in its award.

Gallaher sued the Jacksons for negligence, alleging he was a guest of their tenants, and arguing that he was a third party beneficiary of the lease contract between the Jacksons and the

10

Dykes.[6] Gallaher sought $300,000 in damages for physical and mental pain and suffering, mental anguish, medical expenses, lost wages or earning capacity, and physical impairment. As summary judgment evidence, Gallaher attached affidavits by Mr. and Mrs. Dyke, in which they said (1) the Jacksons retained responsibility for maintaining and repairing the home, (2) the Dykes were unaware that the glass panels were not safety glass, (3) they assumed the house was safe for themselves and their visitors, and (4) Gallaher was in the house at their invitation. The Jacksons contested their liability throughout, arguing that they owed Gallaher no duty because a landlord is not liable to tenants or their guests for injury due to a dangerous condition in place when the tenants took possession. *See* Restatement (Second) of Torts § 365 (1983). The Jacksons further argued that they were not in possession of the property and did not know and had no reason to know of the danger.

The Dykes argue that because the Jacksons contested liability and because Gallaher's claims would have failed had they not been settled, the settlement was unreasonable and not made in good faith. However, the Jacksons had already filed one motion for summary judgment against Gallaher's claims, which was denied, and even assuming Gallaher could not succeed on any of his claims, the Jacksons would still have incurred further attorney's fees in their defense of the suit. At the time of summary judgment against the Dykes, the Jacksons had already incurred attorney's fees in an amount almost double the amount of the settlement. The Dykes presented no evidence showing that, had an insurance policy been in place, the claim would not have been covered, an insurance company defending the Jacksons would not have settled Gallaher's claims, or that the

---

[6] The Dykes assert that Gallaher added his third-party beneficiary claim after his cause was severed from the Jacksons' claims against the Dykes. However, the record shows that he amended his petition to add this claim in November 2002, several months before the severance and settlement.

settlement was unreasonable. Had the Jacksons been insured, the insurance company would have been obligated to defend the suit, thus sparing the Jacksons from incurring $76,000 in attorney's fees, and would have paid the settlement or any damages awarded after a trial.

The Jacksons showed that they incurred $121,000 in defending and settling the suit, a sum which would presumably have been covered by the insurance policy, had the Dykes procured it, and the Dykes did not raise a fact issue as to whether the $45,000 settlement was unreasonable or entered into in bad faith. Therefore, the trial court did not err in awarding the Jacksons $121,000.

## Conclusion

We have determined that the Jacksons established as a matter of law that they were entitled to judgment as to the Dykes' contractual obligation to obtain insurance. Therefore, the trial court did not err in granting summary judgment in favor of the Jacksons. Further, the Dykes did not raise a question of fact as to whether the settlement was unreasonable or made in bad faith. Therefore, the trial court did not err in awarding the Jacksons $121,000. Due to our resolution of the insurance issue, we need not address whether the Jacksons were entitled to indemnification by the Dykes. We affirm the judgment of the trial court.

_____

David Puryear, Justice

Before Chief Justice Law, Justices Patterson and Puryear

Affirmed

Filed: August 10, 2005

12