NUMBER 13-05-534-CV



COURT OF APPEALS



THIRTEENTH DISTRICT OF TEXAS



CORPUS CHRISTI - EDINBURG







BP CHEMICALS, INC.
, Appellant,


v.



AEP TEXAS CENTRAL COMPANY FORMERLY KNOWN AS 

CENTRAL POWER AND LIGHT COMPANY, Appellee.





On appeal from the 24th District Court


of Calhoun County, Texas.






O P I N I O N 



Before Chief Justice Valdez and Justices Yañez and Castillo


Opinion by Justice Castillo



 Appellant, BP Chemicals, Inc. ("BP"), appeals from the trial court order denying
its motion for summary judgment and granting the motion for summary judgment of
appellee, AEP Texas Central Company ("AEP"), formerly known as Central Power and
Light Company ("CP&L"). We affirm. 

I. Background

 BP operates a co-generation facility known as the Green Lake Plant in Calhoun
County, Texas. "Co-generation involves the simultaneous production of electrical
power and thermal energy, such as heat or steam, usually at an industrial site." Pub.
Util. Comm'n v. Gulf States Utils. Co., 809 S.W.2d 201, 203 (Tex.1991). Congress,
in order to promote energy conservation, requires electric utilities to purchase co-generated electricity from qualifying facilities, such as the Green Lake Plant, and to
provide back-up power to those facilities on a nondiscriminatory basis. See the Public
Utility Regulatory Policies Act ("PURPA"), 16 U.S.C.A. § 824a-3 (West 2000). 

 In 1999, the Texas Legislature passed Senate Bill 7, amending the Public Utility
Regulatory Act ("PURA") and deregulating the Texas electricity market. (1) Deregulation
required each integrated electric utility to partition itself into three companies: (1) a
power generation company, (2) a transmission and distribution provider, and (3) a retail
electric provider. (2) The Public Utility Commission of Texas ("PUC") was given
jurisdiction over the Texas electricity market, (3) and it closely regulates the transmission
component of the industry. (4) Rates for power are now determined by a competitive
market. (5) 

 Texas operates an independent and self-contained electric production and
transmission grid; its system operator is the Electric Reliability Council of Texas
("ERCOT"). (6) ERCOT is charged with ensuring system reliability, nondiscriminatory
access to the transmission and distribution system, access to market information, and
clearance of all market transactions. (7) ERCOT is also required to ensure accurate
accounting of electricity production and delivery between generators and wholesale
buyers and sellers in the region. (8) In conjunction therewith, "ERCOT Procotols" have
been developed which provide the framework for the administration of the Texas
electricity market. (9) Utilities are required to abide by the procedures established by
ERCOT. See Tex. Util. Code Ann. §39.151(j) (Vernon Supp. 2005); Hammack v. Pub.
Util. Comm'n of Tex., 131 S.W.3d 713, 718 (Tex. App.-Austin 2004, pet. denied). 

 Beginning in 1981, BP and AEP (10) entered into a series of contracts, by which
CP&L agreed to take and pay for excess electricity generated at the plant. The parties
operated successfully under these contracts until 2001. Because of deregulation, and
the need for CP&L to "unbundle" its integrated services into separate companies,
notice of cancellation of the contract was provided to BP on November 29, 2001,
effective December 21, 2001. CP&L's business was unbundled effective January 1,
2002. Until then, it continued to operate as a utility generating, purchasing,
transmitting, and selling electricity to retail customers. 

 However, beginning in August 2001, CP&L failed to pay BP for power
transferred to CP&L by BP at the Green Lake Plant meter (the point of delivery). BP
delivered 7,505 megawatt hours ("Mwh") of electricity through the CP&L meters at
the Green Lake Plant during August 2001. From September 1 through September 25,
2001, BP delivered 5,591 Mwh of electricity to the meters. The total adjusted
avoided energy cost for these two months was $314,920.63 ($206,620.16 plus
$108,300.47). (11) 

 When AEP did not pay for the power delivered during August and September,
BP registered with the ERCOT transmission grid to sell its excess power to third
parties. BP registered with ERCOT on September 1, 2001, and designated a Qualified
Scheduling Entity on September 17, 2001. ERCOT first recognized deliveries from the
Green Lake Plant beginning September 26, 2001. On October 1, 2001, BP executed
a resource agreement with ERCOT. The difference between the monies BP received
for the sale of its power between September 26, 2001, and December 31, 2001, and
the monies that would have been due from AEP pursuant to the contracts totals $118,
541.73. 

 On August 4, 2003, BP brought suit against AEP for breach of contract based
on nonpayment for electrical Mwh delivered during August and September, and the
additional loss when BP was forced to mitigate its damages and seek alternative
purchasers during the remainder of the year 2001. BP included an alternative cause
of action for unjust enrichment or assumpsit. AEP's answer to the suit includes the
affirmative defenses of failure of consideration (12) and excuse from performance as a
result of commercial impracticability, impossibility of performance, and/or frustration
of purpose. (13)

 The basic facts are undisputed between the parties. BP filed a motion for
summary judgment on March 30, 2005, for breach of contract and principal damages
in the amount of $433,462.36, plus attorneys fees and pre- and post-judgment
interest. 

 On May 10, 2005, AEP filed its response to BP's motion and its own motion for
summary judgment. AEP alleged that BP had failed to timely comply with ERCOT
Protocols, including registration and designation of a Qualified Scheduling Entity, and
that failure to do so prohibited AEP from either recognizing deliveries from, or
transmitting any power from BP's plant on the ERCOT grid for the benefit of either BP
or AEP. AEP alleged that while all unbundling did not have to be accomplished until
January 1, 2002, the ERCOT Protocols requiring registration and scheduling became
effective July 6, 2001. 

 BP responded to AEP's motion on May 24, 2005, arguing the following: (1)
utilities were not required to and CP&L did not unbundle its business activities until
January 1, 2002; (2) nothing made it impossible or impractical for BP's deliveries to
be received or compensated; and (3) BP's deliveries, being directly through meters at
exit of the Green Lake Plant, did not require any "transmission" on the ERCOT grid
and, therefore, no ERCOT Protocols were triggered or violated. 

 A hearing on the motions for summary judgment was held June 1, 2005. (14) The
trial court issued a letter to the parties on June 30, 2005, indicating its intent to deny
BP's motion for summary judgment and grant AEP's motion for summary judgment. 
The formal order was signed August 3 and entered of record August 4, 2005. This
appeal ensued. 

II. Issues on Appeal

 BP brings six issues which can be grouped according to the key arguments
presented: (1) with respect to the August and September deliveries, did the trial court
err when it determined that deregulation of the Texas electrical environment relieved
AEP of its contractual obligation to take and pay for excess power generated at the
Green Lake Plant based on AEP's affirmative defense of commercial impracticability
(issues one, two, three and five); and (2) did the trial court err in concluding, with
respect to the loss in sales sustained by BP for power sold to third parties between
September 26 and December 31, 2001, that (a) AEP prevailed on its affirmative
defense of failure of consideration (issues four and five), and (b) that no fact issues
remained to preclude summary judgment (issues six and five). (15) 

 We consider that key questions before this Court include the following: (1)
whether ERCOT Protocols requiring registration by a Qualifying Facility, Resource
Entity, and/or Load Serving Entity (16) and designation of a Qualified Scheduling Entity
became effective July 6, 2001, or January 1, 2002; (2) whether transfer of electricity
from BP directly to the CP&L meter at the Green Lake Plant constituted "transmission"
on the electric grid as that term is understood by Senate Bill 7, the Texas Utility Code,
and the ERCOT Protocols; (3) whether any failure of BP to comply with ERCOT
Protocols rendered it impossible or commercially impracticable for AEP to either
capture or resell the electricity from BP, such that AEP was excused from its
contractual obligations; and (4) whether AEP indicated it would refuse to take delivery
of excess power after September 25, 2001, such that BP was justified in seeking
alternative markets, or whether fact issues remain that preclude summary judgment
on that issue. 

III. Standard of Review

 The function of summary judgment is to eliminate patently unmeritorious
claims and defenses, not to deprive litigants of the right to a jury trial. Alaniz v.
Hoyt, 105 S.W.3d 330, 344 (Tex. App.-Corpus Christi 2003, no pet.). We review
a summary judgment de novo to determine whether a party established its right to
prevail as a matter of law. Provident Life and Accident Ins. Co. v. Knott, 128 S.W.3d
211, 216 (2003); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548-49 (Tex.
1985); Ortega v. City Nat'l Bank, 97 S.W.3d 765, 771 (Tex. App.-Corpus Christi
2003, no pet.). 

 We review the evidence "in the light most favorable to the nonmovant." See
KPMG Peat Marwick v. Harrison County Housing Fin. Corp., 988 S.W.2d 746, 748
(Tex. 1995); Branton v. Wood, 100 S.W.3d 645, 646 (Tex. App.-Corpus Christi
2003, no pet.). We do not disregard evidence in support of the motion, but examine
the entire record, indulging every reasonable inference and resolving any doubts
against the motion. City of Keller v. Wilson, 168 S.W.3d 802, 824 (Tex. 2005). The
movant bears the burden of showing both no genuine issue of material fact and
entitlement to judgment as a matter of law. Alaniz, 105 S.W.3d at 345. We affirm
a trial court's ruling on a summary-judgment motion if any of the theories advanced
in the motion are meritorious. State Farm Fire & Cas. Co. v. S.S., 858 S.W.2d 374,
380 (Tex. 1993).

 The non-movant has the burden to respond to a traditional summary-judgment
motion if the movant conclusively (1) establishes each element of its cause of action
or defense, or (2) negates at least one element of the non-movant's cause of action
or defense. Hoyt, 105 S.W.3d at 345. Thus, summary judgment for a defendant is
proper if the defendant disproves at least one element of each of the plaintiff's claims
or affirmatively establishes each element of an affirmative defense to each claim. Id. 
Where both sides move for summary judgment and the trial court grants one motion
and denies the other, we review both parties' summary-judgment evidence and
determine all questions presented. FM Props. Operating Co. v. City of Austin,
22 S.W.3d 868, 872 (Tex. 2000).

 Matters of statutory interpretation are questions of law, over which we exercise
de novo review. See Sw. Pub. Serv. Co./Pub. Util. Comm'n of Tex. v. Pub. Util.
Comm'n of Tex., 962 S.W.2d 207, 212 (Tex. App.-Austin 1999, pet. denied);
Groomes v. USH of Timberlawn, Inc., 170 S.W.3d 802, 804 (Tex. App.-Dallas 2005,
no pet.). The primary rule of statutory interpretation is that a court must look to the
intent of the legislature and must construe the statute so as to give effect to that
intent. Lee-Hickman's Invs. v. Alpha Invesco Corp., 139 S.W.3d 698, 700 (Tex.
App.-Corpus Christi 2004, no pet.) (citing City of Austin v. L.S. Ranch, Ltd., 970
S.W.2d 750, 752 (Tex. App.-Austin 1998, no writ). We construe the text of an
administrative rule under the same principles as if it were a statute. Phillips Petroleum
Co. v. Tex. Comm'n on Envtl. Quality, 121 S.W.3d 502, 507 (Tex. App.-Austin
2003, no pet.). We further recognize that the legislature intends an agency created
to centralize expertise in a certain regulatory area "be given a large degree of latitude
in the methods it uses to accomplish its regulatory function." Id. at 507-08 (citing
Reliant Energy, Inc. v. Pub. Util. Comm'n, 62 S.W.3d 833, 838 (Tex. App.-Austin
2001, no pet.)); see State v. Pub. Util. Comm'n, 883 S.W.2d 190, 197 (Tex. 1994).

IV. Analysis

A. The August-September Transfers of Electricity

 Several issues raised by BP deal with the transfer of electricity from BP's Green
Lake Plant to AEP during the months of August and September 2001. The number of
Mwh of electricity transferred is undisputed, as are the monies that would have been
due for those Mwh under the contracts. Also undisputed are the following facts: (1)
the transfers, i.e., deliveries, were effected at a meter belonging to AEP located at the
Green Lake Plant; (2) CP&L (i.e., AEP) had not yet unbundled its services; and (3) BP
had not yet registered with ERCOT. 

1. Effective Date of Relevant ERCOT Protocols 

 The statute passed by the Texas Legislature required deregulation and
unbundling of the Texas electricity market by January 1, 2002. Tex. Util. Code Ann.
§§ 39.001(b)(1), 39.051(b) (Vernon Supp. 2005). ERCOT Protocols were issued June
6, 2001, and provide the following:

These Protocols shall be fully effective on January 2, 2002; provided,
however, that individual sections of these Protocols, or portions thereof,
shall be effective on the earlier or later dates as necessary to support the
Market Implementation Plan and the Protocols Implementation Plan as
each is approved by the ERCOT Board and in accordance with applicable
laws and regulations. The Sections of these Protocols related to the
implementation of the wholesale market under a single Control Area shall
be effective on July 6, 2001. All Market Participants (including TDSPs,
Resources, Load Serving Entities, QSEs, and NOIEs) (17) intending to
participate in any aspect of the wholesale or pilot retail market sharing on
July 6, 2001, must register with ERCOT in time to perform under these
Protocols as of July 6, 2001. 


ERCOT Protocol 1.7. Clearly, portions of the ERCOT Protocols, including those
requiring registration that are at issue in this suit, were effective July 6, 2001. The
protocols required registration if a market participant, including one of the type of BP's
Green Lake facility, intended to "participate in any aspect of the wholesale or pilot
retail market sharing." Id. 2. "Transmission" on the Texas Electric Grid and the Need to Register

 BP argues that because it only "transferred" excess power to AEP at the meter
located at the Green Lake plant, it did not "transmit" power on the ERCOT grid and,
therefore, no requirement for registration was triggered. AEP counters that the entire
system automatically became part of the ERCOT grid, and that compliance with the
ERCOT Protocols was a necessary prerequisite to any delivery of power.

 The substantive rules define transmission service as the following:

Service that allows a transmission service customer to use the
transmission and distribution facilities of electric utilities, electric
cooperatives and municipally owned utilities to efficiently and
economically utilize generation resources to reliably serve its loads and
to deliver power to another transmission service customer. Includes
construction or enlargement of facilities, transmission over distribution
facilities, control area services, scheduling resources, regulation services,
reactive power support, voltage control, provision of operating reserves,
and any other associated electrical service the commission determines
appropriate, except that, on and after the implementation of customer
choice in any portion of the Electric Reliability Council of Texas (ERCOT)
region, control area services, scheduling resources, regulation services,
provision of operating reserves, and reactive power support, voltage
control and other services provided by generation resources are not
"transmission service." 


16 Tex. Admin. Code §25.5(141) (2006). The "nature" of transmission service is
described as follows:

Transmission service allows for power delivery from generation resources
to serve loads, inside and outside of the ERCOT region. Service provided
pursuant to Division 1 of this subchapter permits . . . power generating
companies, qualifying scheduling entities, retail electric providers (REPs),
qualifying facilities, and distribution service providers (DSPs) to use the
transmission system of the TSPs in ERCOT. . . . Id. §25.191(c). "Transmission facilities" are defined to include: "power lines;
substations; reactive devices; and associated facilities, operated at 60 kilovolts or
above, including radial lines operated at or above 60 kilovolts, except the step-up
transformers and a protective device associated with the interconnection from a
generating station to the transmission network. Id. §25.192(c)(1). Separate sections
address interconnection of on-site distribution generation, specifying the type of
physical connection, requisite voltage, points of common coupling, etc. See id. §
25.211. Indeed, as a condition to obtaining transmission service, a transmission
service customer that owns electrical facilities in the ERCOT region shall execute
interconnection agreements. See id. §25.195. 

 The definition of transmission, and therefore the ERCOT grid, necessarily
incorporates the delivery of loads from a facility, transmission over distribution
facilities, control area services, scheduling resources, and/or the provision of operating
reserves. The interconnection devices are encompassed within the ERCOT grid. 

 The PUC rules, in addressing compliance with the ERCOT Protocols, also provide
the following:

(a) Initiating Service. Where a transmission service customer uses the
transmission facilities in the Electric Reliability Council of Texas (ERCOT),
whether its own facilities or those of another transmission service
provider (TSP) to serve load or to make sales of energy to a third party,
it shall apply for transmission service pursuant to this section, the ERCOT
Protocols, and commission-approved tariffs. 


(b) Conditions precedent for receiving service. . . . TSP will provide
transmission service to any transmission service customer as that term
is defined in § 25.5 of this title (relating to Definitions), provided that: 
(1) the transmission service customer has complied with the applicable
provisions of the ERCOT protocols . . . 


(c) Procedures for initiating transmission service. A transmission service
customer requesting transmission service . . . must comply with the
ERCOT protocols and commission-approved tariffs. 


Id. § 25.198(a)-(c). We conclude that any use of the system that involves transfer of
power from one facility to another, whether to "serve loads," or for sale to a third
party, and whether through transmission lines or a transfer at a meter located at the
exit of a generating plant to the transmission lines, constitutes use of the transmission
portion of the grid such that compliance with the ERCOT protocols is required.

3. Compliance with ERCOT Protocols as a Precondition 

to Enforcement of Contractual Obligations


 In response to BP's claims for breach of contract or, alternatively, unjust
enrichment, AEP raised the affirmative defense of excuse from performance as a result
of commercial impracticability, impossibility of performance, and/or frustration of
purpose. The defense is based upon the new legislation which, AEP urges, created
new preconditions to acceptance, or "delivery" of power, and BP's failure to comply
therewith. AEP contends that BP's failure to comply with the ERCOT Protocols, by
registering and identifying a Qualified Scheduling Entity, rendered it impossible or
commercially impracticable for AEP to either capture or resell the electricity from BP,
such that AEP (1) was excused from any contractual obligations to BP during the
period of noncompliance, and (2) did not benefit from the transfer of electricity.

 It is undisputed that in excess of 13,000 Mwh of power were sent by BP to
AEP during August and September 2001, and that AEP did not pay for this power. 
AEP argues that because BP failed to comply with the new regulations, BP did not
"sell" any power to AEP and AEP's compliance with contractual terms was no longer
possible or practicable. Indeed,

"Where . . . a party's performance is made impracticable . . . by the
occurrence of an event the non-occurrence of which was a basic
assumption on which the contract was made, his duty to render that
performance is discharged . . . ." Restatement (Second) of Contracts
§ 261 (1981). A governmental regulation or order that makes
impracticable the performance of a duty "is an event the non-occurrence
of which was made a basic assumption on which the contract was
made." Restatement (Second) of Contracts § 264 (1981). 


Centex Corp. v. Dalton, 840 S.W.2d 952, 954 (Tex. 1992). In support of this
argument, AEP provided the trial court with (1) BP's answers and objections to
interrogatories; (2) the Resource Entity Agreement between BP and ERCOT, dated
October 1, 2001; and (3) the affidavit of Richard Byrne, Manager of Rates for AEP. 
In the affidavit, Byrne relates the following: (1) beginning July 6, 2001, all electricity
deliveries into the ERCOT system needed to be scheduled by BP through ERCOT; (2)
the meters at the interconnection between BP and the ERCOT transmission grid,
although owned and maintained by AEP, were registered as ERCOT polled settlement
meters and read by ERCOT; (3) only scheduled electricity deliveries are recognized by
the system and credited to the respective resource (here, BP); and (4) without
registration and scheduling by BP, it was not possible to recognize electricity deliveries
as being from a valid sale of power in the wholesale market. Consequently, Byrne
urged that (1) until BP completed its registration, it was impossible to give BP credit
for energy produced and flowing through AEP's meters; (2) any such power was not
eligible for payment; and (3) because that power was not identified as being input into
the grid for the benefit of either BP or AEP, AEP was required to purchase its power
elsewhere to satisfy its load requirements. Byrne's affidavit states: 

Although electricity may have flowed from the Plaintiff's plant through
the ERCOT EPS meters owned by AEP between July 6 and October 1,
2001, such electricity did not accrue to the advantage of AEP as that
electricity flowed into the ERCOT transmission grid without being
scheduled and balanced with an AEP load; therefore it could not be
credited to any entity. Only the ERCOT grid, as a whole, benefitted from
the electricity produced by the Green Lake Plant. 


 BP's reply to AEP's motion for summary judgment referenced the affidavit of
Bernardo Hernandez which BP had tendered (18) with its motion for summary judgment. 
Hernandez, Director of Energy Management Services for BP, in this regard asserts only
that excess electricity was generated at the Green Lake Plant, and it was delivered
through the AEP meters according to the contract with AEP. Hernandez also itemizes
the Mwh of electricity passing through the meters in August and September 2001. 

 On appeal, BP argues that AEP failed to establish its affirmative defense because
the regulations did not require unbundling and AEP (CP&L) did not unbundle prior to
the deadline of January 1, 2002. BP does not address other effective dates of the
ERCOT Protocols. BP instead argues that a Federal Energy Regulatory Commission
("F.E.R.C.") order of May 17, 2001, recognized by the Texas PUC in its order of June
20, 2002, required electric utilities to continue to meet their contractual obligations
to purchase power from qualifying facilities notwithstanding deregulation of the Texas
electricity market. The federal order, Cogen Lyondale, Inc., (19) 95 F.E.R.C. ¶ 61,243

 at 61,836 (May 17, 2001), provides:

The Texas QFs ["Qualifying Facilities"] ask the Commission to declare
that under PURPA the restructured utility holding company systems in
Texas continue to satisfy the definition of electric utility and continue to
have an obligation to make purchases from the Texas QFs. . . . We will
therefore grant the Texas QF's request for declaratory order, to the
extent that they are requesting the Commission to state that any
company which meets the PURPA definition of electric utility following
restructuring has a purchase obligation as set forth in 18 C.F.R. §
292.303 (2000). 

Id. (20) The PUC Order, enacted subsequent to the action taken by the F.E.R.C., states
as follows:

The commission finds that it has the obligation to implement PURPA and,
thus will do so through this rulemaking rather than allowing self-implementation. The commission's instruction at its December 19, 2001
open meeting that the ERCOT electric utilities, as defined by PURPA,
continue fulfilling their mandatory purchase obligations at market prices
until this proposed rule becomes finalized was meant to be strictly
transitional.


See In Re Arrangements Between Qualifying Facilities and Electric Utilities, 2002 Tex.
PUC LEXIS 26, at *12 (June 20, 2002). The Order goes on to address calculation of
avoided cost rates, and clarifies the commission's agreement with Texas QFs that "a
two-step process whereby the commission adopts a transitional avoided cost pricing
methodology that relies on a reasonable proxy for prices until a liquid, real-time market
develops is reasonable and preferable." Id. at *13. Any ultimate development of a
liquid spot market would be facilitated by "relaxation or elimination of ERCOT's
balanced schedule requirement." Id. Therefore, the scheduling requirement is part of
the transitional period from a fully regulated to a real-time competitive market. The
scheduling requirement was clearly in effect during the period of September-October
2001 and was not obviated by the Order. Further, the Order contemplates a direct
delivery system, such as that between the Green Lake Plant and the AEP/ERCOT
meters, reiterating that "delivery from the QF may be directly connected via the
affiliated TDU" to the transmission and/or distribution grid. We consider this to mean
the interconnection at the meter was, in effect, to the ERCOT grid. Finally, nothing
in any of the cited orders sanctions non-compliance with ERCOT regulations. 

 "A promissor may be excused from performance of a contract by intervening
changes in the law." Int'l Bank of Commerce of Laredo v. Union Nat'l Bank of Laredo,
653 S.W.2d 539, 550 (Tex. App.-San Antonio 1983, writ ref'd n.r.e.); see also
Tractebel Energy Mtkg., Inc. v. E.I. DuPont DeNemours & Co., 118 S.W.3d 60, 64-65
(Tex. App.-Houston [14th Dist.] 2003, pet. denied) (noting that in regard to a contract
for service, "a change in the law that makes performance illegal also renders it
impracticable."). 

 Here, we have the violation of a statute that mandated compliance with a
scheduling requirement no later than July 6, 2001. Enactment of the scheduling
requirement did not undermine or impair satisfaction of PURPA's objectives; instead,
it simply added a state requirement to register and designate a Qualified Scheduling
entity. In addition, AEP included in its summary judgment evidence the affidavit of
Richard Byrne, Manager of Rates for AEP. As noted above, Byrne asserted that,
absent registration, it was not possible to either recognize, identify, or credit
unscheduled power for the benefit of either BP or AEP. 

 We determine that BP was required to register with ERCOT for any transmission
of power onto the ERCOT grid, and that the transfer at the AEP meters was "onto the
ERCOT grid." We further determine that AEP's affidavit of Byrne directly asserts that
absent that registration, power contributions could not be attributed to the benefit of
either BP or AEP. The affidavit was properly submitted as part of AEP's summary
judgment evidence and speaks directly to implementation of the ERCOT grid and its
operations. (21) 

 Byrne's affidavit could have been controverted by BP. It was not. The affidavit
of Hernandez, tendered by BP, did not address the relationship to or operations of the
ERCOT market or grid. Uncontroverted evidence of an interested witness or an expert
witness is sufficient to establish a matter conclusively if the evidence is clear, positive,
direct, otherwise credible and free from contradictions and inconsistencies, and could
have been readily controverted. Tex. R. Civ. P. 166a(c); City of Keller, 168 S.W.3d
at 820; Casso v. Brand, 776 S.W.2d 551, 557-58 (Tex. 1989). 

 We conclude the trial court (1) did not err in finding that AEP conclusively
established its affirmative defense of commercial impracticability, impossibility of
performance, and/or frustration of purpose; and (2) did not err in granting summary
judgment in favor of AEP as to power transfers made during August and September
2001. We overrule BP's issues one, two, three, and five, as they relate to the August
and September 2001 power transfers. 

B. The September-December 2001 Sales

 BP, in its fourth issue, addresses the time frame of September 26 to December
31, 2001, and BP's claim for the difference between the amount it received and what
it should have received for the sale of its power. After September 25, 2001, BP sold
its excess power to third parties, after AEP had failed to pay for the August and
September deliveries. AEP responded with the affirmative defense of failure of
consideration, following upon its argument that there was no breach because AEP was
excused from performance under the contract as to the August and September
deliveries because of commercial impracticability, impossibility of performance, and/or
frustration of purpose. The question arising with respect to the later deliveries is, in
essence, whether, if there was a breach by AEP, BP was justified in working to
mitigate its damages and is therefore entitled to recover the difference in monies
recovered, or whether, if there was no breach, AEP indicated it would refuse to take
delivery of excess power after September 25, 2001, such that BP was justified in
seeking its alternative markets. (22) In issue six, BP contends that, in the alternative,
issues remain that preclude summary judgment with respect to the September 26
through December 31, 2001, deliveries. (23) 

 Summary judgment evidence tendered by BP addresses the amount of scheduled
power deliveries into the ERCOT grid between September 26 and December 31, the
monies BP received for the sale of that power to third parties, and the monies BP
would have received had AEP purchased the power pursuant to the contracts. The
Hernandez affidavit relates that "because it was obvious that CP&L [AEP] did not
intend to honor its commitments, BP was forced to mitigate its damages by selling the
excess power from the Green Lake plant to other purchasers at prices below what was
due under the contract with CP&L [AEP]." BP requests the difference of $118,541.73
as damages. Summary judgment evidence tendered by AEP, including the affidavit of
Byrne, reflects the following: 

During the period of September 26, 2001, through December 31, 2001,
19,708 Mwh of electricity from the Green Lake Plant passed through the
ERCOT EPS metering maintained by AEP at the Green Lake Plant. . . . 
After October 1, 2001, such electricity could have been sold to AEP, and
AEP would have paid for such power pursuant to the contracts. 
However, the Plaintiff chose to sell its power to a third party who was
scheduled as receiving such power in the ERCOT market.


There is no other evidence relating to either an attempt to sell the power to AEP or
AEP's intent had it been approached about the sales. Given our conclusion that AEP
was excused from performance under the contracts during August and September
2001, BP bore the burden to show that it was excused and entitled to mitigate its
damages because AEP refused, or indicated its intent to refuse, to comply with the
contracts between September 26 and December 31, 2001. As noted above, where
affidavit testimony is clear, positive, direct, otherwise credible and free from
contradictions and inconsistencies, and could have been readily controverted but was
not, it is sufficient to establish a matter conclusively. Tex. R. Civ. P. 166a(c); City of
Keller, 168 S.W.3d at 820; Casso, 776 S.W.2d at 557-58. We conclude the trial
court did not err in granting summary judgment in favor of AEP, where the only
evidence before the trial court indicates AEP's willingness to have complied with the
contracts subsequent to BP's registration, had it been given the opportunity. We
overrule BP's fourth issue and its fifth issue as it relates to the September 26 through
December 31,2001, transfers of electricity.

V. Conclusion

 We affirm the judgment of the trial court in its entirety.

 

 ERRLINDA CASTILLO

 Justice


Opinion delivered and filed 

this 3rd day of August, 2006.


 


 
1. See Act of May 27,1999, 76th Leg., R.S., ch. 405, 1999 Tex. Gen. Laws 2542, 2542-2635
(codified at Tex. Util. Code Ann. §§ 39.001-.910 (Vernon Supp. 2005)) (hereinafter the "Act").
2. Tex. Util. Code Ann. §§ 39.051 (Vernon Supp. 2005).
3. See Tex. Commercial Energy v. TXU Energy, Inc., No. C-03-249, 2004 U.S. Dist. LEXIS
13908, at *8-*9, 2004-2 Trade Cas. (CCH) ¶ 74,497 (S.D. Tex. June 24, 2004), aff'd, 2005 U.S.
App. LEXIS 11553 (5th Cir. 2005). 
4. TXU Generation Co. v. Pub. Util. Comm'n, 165 S.W.3d 821, 827 (Tex. App.-Austin 2005,
no pet.). 
5. Tex. Commercial Energy, 2004 U.S. Dist. LEXIS 13908, at *9.
6. Tex. Util. Code Ann. §39.151 (Vernon Supp. 2005); Tex. Commercial Energy, 2004 U.S. Dist.
LEXIS 13908, at *9. 
7. Tex. Util. Code Ann. § 39.151 (Vernon Sup. 2005); Tex. Commercial Energy, 2004 U.S. Dist.
LEXIS 13908, at *9.
8. Tex. Util. Code Ann. §39.151 (Vernon Supp. 2005). 
9. Tex. Commercial Energy, 2004 U.S. Dist. LEXIS 13908, at *9.
10. The contracts in issue between BP & AEP were initially entered into by their predecessors in
interest, Vistron Corp. and, later, Sohio Chemicals Corp. for BP, and CP&L for AEP. CP&L provided
electric power to the Green Lake Plant and also purchased, generated, transmitted, distributed, and sold
electric power in Texas. The contract was modified at different times over the years to adjust the
means of calculating costs to be paid for BP's excess power, based upon adjusted avoided energy costs.
11. The parties do not dispute the amount of electricity metered during the periods in dispute. 
There is also no dispute as to the calculated values of the adjusted avoided energy costs, as they would
be determined pursuant to formulas set forth in the contracts.
12. This affirmative defense was included in AEP's first amended answer filed May 10, 2005. 
13. This affirmative defense was included in AEP's supplemental answer filed May 24, 2005. 
14. No reporter's record of those proceedings has been provided to this Court. 
15. Issue five asks whether the trial court erred in granting AEP's motion for summary judgment. 
16. Each term describing BP's status is specifically defined in the ERCOT Protocols; it is
undisputed that at the point when BP sought access to the transmission grid, it was required to register
and make the proper designations. 
17. The ERCOT Protocols include an extensive list of various definitions for acronyms such as
these. The parties do not disagree that BP's Green Lake Plant, as a Qualifying Facility, fit the
definitions, among others, of Resource and Load Serving Entity. It is undisputed that at the point when
BP sought access to the transmission grid, it was required to register and make the proper designations. 

18. Although AEP raised objections that some statements in the Hernandez affidavit were
conclusory only, no rulings on those objections are included in the trial court order disposing of the
motions for summary judgment. 
19. The Order is formally entitled "Order Granting Declaratory Order and Denying Waiver of
Regulations Implementing PURPA." "PURPA" is the Public Utility Regulatory Policies Act of 1978, Pub.
Law No. 95-618, 92 Stat. 3117 (codified as amended in scattered sections 815, 816, 843-43 of title
16 of the United States Code), and gives Qualifying Facilities ("QFs") such as the Green Lake Plant the
right to sell (put) electricity to electric utilities at "avoided costs." The F.E.R.C. order denied the QFs
the waiver they sought, holding instead that a state commission must "maintain its obligation to
implement PURPA after unbundling and the commencement of competition." See In Re Arrangements
Between Qualifying Facilities and Electric Utilities, 2002 Tex. PUC LEXIS 26, at *3 (June 20, 2002).
20. This obligation to accept excess power relates to obligations under PURPA and is not co-incident with the contractual obligations in issue here. 
21. "The Restatement says that the question of impracticability 'is generally considered to be one
of law rather than fact.'" Tractebel Energy Mtkg., Inc. v. E.I. DuPont DeNemours & Co., 118 S.W.3d
60, 65-66 (Tex. App.-Houston [14th Dist.] 2003, pet. denied) (citing Restatement (Second) of
Contracts, ch. 11, introductory note, p. 310 (1981)). However, "the very case cited by the
Restatement in support of that position suggests it is a mixed question of law and fact." Id. (citing
Restatement (Second) of Contracts, ch. 11, introductory note, p. 310 (1981); Mitchell v. Ceazan Tires,
Ltd., 153 P.2d 53, 54 (Cal. 1944) ("[impossibility] is a conclusion of law drawn by the court from the
facts of a given case.")). 
22. See Turner, Collie & Braden, Inc. v. Brookhollow, Inc., 642 S.W.2d 160, 165 (Tex. 1982) ("It
is well established that the plaintiff in a breach of contract action can only recover 'such damages as
he could not have prevented with reasonable exertions and expense.'") (citing Walker v. Salt Flat Water
Co., 128 Tex. 140, 96 S.W.2d 231, 232 (Tex. 1936)).
23. Issue five also applies to these deliveries, as it contends the trial court erred in granting AEP's
motion for summary judgment.