# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-24-00352-CV

---

### Border to Border Exploration, LLC and BBX Operating, LLC, Appellants

### v.

### BP America Production Company, Appellee

---

### FROM THE 250TH DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-18-007367, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

Appellee BP America Production Company (BP) sued appellants Border to Border Exploration, LLC and BBX Operating, LLC (collectively, BBX) for breach of contract and other claims arising out of a development agreement between the parties (the BP Agreement). Following a bench trial, the district court rendered judgment in favor of BP. In four issues on appeal, BBX assert that the district court erred in (1) concluding that BBX breached the contract; (2) concluding that BBX were liable to BP under alternate quasi-contract claims for quantum meruit or unjust enrichment and money had and received; (3) either excluding or failing to consider testimony relating to the parties' understanding of the agreement during contract negotiations; and (4) concluding that BBX's defenses to performance of the contract failed as a matter of law. For the following reasons, we will affirm the district court's judgment.

# BACKGROUND[1]

BP, BBX, and another company, Trinity River Resources, L.P. (Trinity River), entered into the BP Agreement in 2013. The BP Agreement identified 6,513.11 net mineral acres owned by BP within the project area (the Acreage). Under the BP Agreement, BBX and Trinity had the exclusive right to perform seismic studies on the Acreage and to lease any of the Acreage for a proposed well, and BP had the option to participate as a working interest owner in any wells proposed on the Acreage. The BP Agreement granted BP a seismic license obtained on the Acreage and a credit of $200 per net mineral acre on any Acreage included within any seismic study. The agreement further provided that BP would receive an additional credit of $400 per net mineral acre on any Acreage that BBX and Trinity elected to lease from BP. BP could utilize the credits to pay for its proportionate share of the costs to participate in any proposed well included within the Acreage.

BBX and Trinity completed the seismic study on the Acreage and provided BP with the seismic data. The credit available to BP following the study amounted to $1,302,622.00 (calculated as $200 per net mineral acre multiplied by 6513.11 net mineral acres), which BP could use to participate in proposed drilling and exploration activities under the agreement. However, BBX and Trinity River did not lease any of the Acreage, did not engage in any exploration activities, and did not propose any wells on the Acreage. Because BBX and Trinity River did not exercise their option under the agreement to lease any of the Acreage, there was never any leasing credit provided to BP, and BP's drilling credit of $1,302,622.00 was never used in connection with any drilling or exploration activities on the Acreage.

---

[1] The following is taken from a joint stipulation of evidence submitted by the parties and testimony and other evidence admitted at the bench trial.

In March 2015, the parties amended the BP Agreement to require BBX and Trinity to commence the actual drilling of a first test well on or before March 1, 2016. BBX and Trinity failed to do so, and they requested that the deadline be extended again, this time to September 1, 2016. BP declined the request and notified BBX and Trinity that because they did not commence the actual drilling of a test well by the deadline, the agreement had terminated. BP demanded that BBX disburse to BP all drilling credits in the BP drilling account, in the amount of $1,302,622.00.

BBX Land Manager Blake Biscoe then sent out a series of cash calls attempting to collect this amount from other oil and gas companies that it had partnered with in other agreements. Many of these companies had paid BBX earlier following a September 2013 cash call to collect funds for the BP credit, but BBX had already spent that money. In a November 2015 email to a BBX accountant, Biscoe wrote that the money from the 2013 cash call "was to be left in escrow" for BP, but he added that "I am not sure if this ever got set up!" In response to that email, the accountant wrote, "I do know for sure that we would not have put any funds in any kind of 'escrow' because we haven't ever done that with any of our accounts. We spend every dollar that comes in here if it's not already spent by the time the money gets to us." In another email, Biscoe wrote to the accountant that one of their partner companies had "paid their first cash call on the BP Seismic Option. Which we spent somewhere else." He then asked the accountant, "Do we need to contact their accounting and let them know the [earlier] cash call payment was allocated to other expenses?" The accountant replied, "However you want to handle it. Yes, it needs to be explained that the first cash call was allocated to other costs and I can show them where it was applied and that they need to pay this one."

BBX and Trinity never paid BP its $1,302,622.00 credit. In 2018, BP filed suit against BBX, asserting claims for breach of contract, quantum meruit, and money had and received. Trinity River had filed for bankruptcy protection in 2016 and could not be joined as a party to the action. The case proceeded to a bench trial, at which two witnesses testified: Zach Murchinson, a litigation analyst for BP, and Mark Helmueller, general counsel for BBX.

Murchinson testified that the purpose of the BP Agreement was for BBX "to come in, have access to BP America's Acreage, and then potentially explore and hopefully develop oil and gas wells." BP's obligations under the agreement were "to give access to that 6,500 acres for the seismic testing and then pay our proportionate share of any wells that we— we jointly decided to drill." BP satisfied its obligation to give BBX access to its Acreage, and BBX confirmed in an email that they had performed seismic testing on that Acreage, entitling BP to a $200 credit per net mineral acre, which amounted to $1,302,622.00. Murchinson added that "no other credits were earned" by BP under the agreement because BBX did not exercise their option to lease any of the Acreage.

Murchinson further testified that the agreement required BBX to set up a drilling account on behalf of BP, so that "any seismic fees that we had earned would be deposited in this account that we could then later use to pay for our proportionate share of the cost . . . of any future wells." This provision of the agreement further required BBX to disburse those credits to BP either "upon 30 days written notice" to BBX or "at the end of the agreement either by termination or three years after the effective date of the agreement." Murchinson confirmed that BP was "never paid for their earned credits in this Acreage" and "received nothing" in exchange for giving BBX access to its Acreage and allowing BBX to perform the seismic testing, although he later acknowledged that BP had received data from the seismic testing.

Murchinson also explained that he had "access to all of [BP's] corporate records and communications" regarding the agreement and that "[t]here were no extraneous oral communications" regarding the parties' obligations under the agreement: "Everything was contained in the agreement itself." He also testified that in his review of BP's records and communications, he found nothing regarding any statements from BBX to the effect that the drilling credits would not be paid to BP until BBX was able to collect those funds from outside sources.

BBX's general counsel Helmueller testified that he assisted in negotiating the agreement with BP. He recounted that before entering into that agreement, BBX and Trinity River had entered into other agreements with other oil and gas companies. These agreements were called the Make My Day Joint Venture and Development Agreement (Make My Day Agreement) and the Oil & Gas Lease Acquisition Feel Lucky Prospect Agreement (Feel Lucky Agreement). The BP Agreement was "made subject to" these other agreements. Helmueller testified that the parties to these other agreements "had certain participation options and rights under those agreements, and those parties were not mentioned within the parties to the [BP] Development Agreement as individual parties." Helmueller explained that "[t]hose agreements identified the folks that would be participating in any acquisitions, in any development activities within the BP development area in addition to BP." According to Helmueller, BBX did not have any payment obligations under these agreements if calls were made to fund operations. Instead, "[t]hey would be making the request for payment from the parties." Thus, if BBX needed help to provide funds under their agreement with BP, the source of those funds "would have been the folks with the participation options" under the other agreements.

Helmueller was asked whether, in the course of negotiations with BP, he had discussions with BP "about the source of the payments." BP objected that such testimony was inadmissible parole evidence, that "the agreement speaks for itself," and that the agreement contained a merger clause "that says that's all incorporated into the written agreement." The district court initially sustained the objection but allowed BBX to make an offer of proof on the matter. In the proffer, Helmueller testified as follows:

Q. Mr. Helmueller, did the parties have discussions about the source of payments that would be made, if—if any, to BP under the Development Agreement?

A. Yes, we did.

. . . .

Q. And what were those discussions?

A. Those discussions were whether—what parties were going to be named as parties participating in the Development Agreement, and BP—and we advised them that we had other obligations with regard to participation for the parties under those two agreements, and that—that they would be the folks that would be funding anything associated with any well development or any other activities within the Development Agreement area.

Q. And did BP make any objection to that?

A. Yes. BP did not want to be—have numerous small parties subject to the same Development Agreement.

. . . .

Q. Was it your belief that BP understood that the source of payments would be from those interest owners that participate—participants?

6

A. They understood and we reinforced that by having the two agreements added as material contracts and subject to the underlying Development Agreement.

Q. Did you specifically tell BP that the source of payments would be from those participants and interest owners?

A. Yes.

Q. Did BP object to including the language incorporating those—incorporating those agreements and making the BP Agreement, Development Agreement, subject to those agreements?

A. Not that I'm aware.

After that, the district court withdrew its ruling sustaining the objection and informed the parties that it was "leaving open" the admissibility of the evidence until it decided the case.

Helmueller went on to testify that when BBX needed to collect money to fund an operation, BBX's land manager would send out a "cash call" to the participants in the other agreements, and this is what BBX did in 2016 after BP requested disbursement of its credits. However, according to Helmueller, BBX was unable to obtain payments from those participants at that time, and as a result, BBX was unable to pay BP. In Helmueller's view, the BP Agreement did not require BBX to pay BP until BBX was first paid by the other companies. He acknowledged that there was no "specific language" in the BP Agreement providing that BP would not get paid until BBX was paid by others, but he testified that BBX told BP during contract negotiations that BBX "would not pay" BP. Instead, BBX would disburse to BP the payments made by the participants in the other agreements.

At the conclusion of trial, the district court took the case under advisement and later rendered judgment for BP, awarding it actual damages in the amount of $1,302,622.00,

court costs, and pre-and-post-judgment interest at the rate of 8.5%. The district court made findings of fact and conclusions of law, including the following:

> Plaintiff, each of the Defendants, and [Trinity River] are parties to a now expired Development Agreement dated December 1, 2013 (the "Development Agreement"), which was introduced into evidence at trial as PX-2 and DX-1.

> The Development Agreement is a valid and enforceable contract.

> Neither Plaintiff nor Defendants have alleged that the Development Agreement is ambiguous.

> At all relevant times, [BP] owned the mineral rights to 6,513.11 net mineral acres in Jasper County, Texas (the "Contract Acreage") which were subject to the Development Agreement.

> Pursuant to Section 5.01 of the Development Agreement, Defendants and Trinity River had the exclusive right to conduct seismic surveys on the Contract Acreage within 18 months after execution of the Development Agreement.

> Pursuant to Section 5.04 of the Development Agreement, [BP] was granted a Seismic License obtained on the Contract Acreage and, pursuant to Section 5.02, a credit of $200 per net mineral acre on any of the Contract Acreage included within any seismic study.

> Defendants and Trinity River completed the seismic study on all of the Contract Acreage and gave [BP] the seismic data for its Contract Acreage as provided for under the Development Agreement.

> The Seismic Permit Fee earned by BPAPC on the Contract Acreage was $1,302,622.00 (calculated as $200 per net mineral acre x 6.513.11 net mineral acres). Pursuant to Section 3.05(a) of the Development Agreement, this fee was credited by Defendants and Trinity River to a BP Drilling Account and could unilaterally be used by [BP] as a Drilling Credit to pay its proportionate share of expenses associated with any wells on the Contract Acreage.

Defendants, Trinity River, and other affiliated entities, such as Kodiak Resources, Inc. ("Kodiak"), are parties to other Development Agreements and Lease Acquisition Agreements, referred to as the "Make My Day Agreement" and the "Feel Lucky Agreement." Several third parties, not relevant to the Development Agreement, are also parties to the Make My Day and Feel Lucky Agreements.

In September 2013, after execution of the Development Agreement, Defendants, Trinity River, and/or Kodiak sent a cash call to other parties to the Make My Day and/or Feel Lucky Agreements to collect funds in connection with the Drilling Credit to be issued to BPAPC in the amount of $1,302,622. Defendants and Trinity River collected money from these other parties as a result of this cash call but did not segregate this money or hold it in escrow for benefit of [BP] to be used as a Drilling Credit. Rather, Defendants and Trinity River used this money to pay other expenses.

Defendants and Trinity River did not lease any of the Contract Acreage, did not engage in any exploration activities, and did not propose any wells on the Contract Acreage prior to the expiration of the Development Agreement.

[BP] performed all of its obligations under the Development Agreement.

Pursuant to Section 3.05(a) of the Development Agreement, [BP] was entitled to have all or any portion of the Drilling Credits disbursed upon 30-days' written notice to Defendants and Trinity River. Also, Defendants and Trinity River were required to disburse to [BP] any unused portion of the Drilling Credit at the earlier of (A) three years after the Effective Date of the Development Agreement or (B) upon the termination of the Development Agreement.

Section 3.05(a) of the Development Agreement imposed this obligation to return [BP]'s Drilling Credit, at whatever time, upon Border, upon BBX Operating, and also upon Trinity River.

On March 9, 2016, [BP] notified Defendants and Trinity River by letter that [BP] (A) declined their request to extend the deadline for the commencement of drilling activities from March 1, 2016 to September 2016, (B) notified them that the Development Agreement had terminated pursuant to Section 3.09 due to their failure to drill a test well, and (C) demanded that they disburse to [BP] the unused Drilling Credits in the amount of $1,302,622.

9

In 2016, Defendants, Trinity River, and Kodiak sent a second cash call to other parties to the Make My Day and/or Feel Lucky Agreements to collect funds in connection with the Drilling Credit to be issued to [BP] in the amount of $1,302,622. Defendants and Trinity River did not collect any money from these other parties as a result of this second cash call.

Defendants and Trinity River did not disburse any amount of the remaining Drilling Credits to [BP]. By failing to do so, Defendants and Trinity River each breached the Development Agreement.

The Development Agreement is unambiguous and therefore its interpretation is a question of law for this Court to determine.

Section 7.19 of the Development Agreement contains a merger clause. As a result of the application of this clause, any prior oral statements by the parties during negotiations are not a part of the parties' contractual agreement.

None of the obligations imposed by the Development Agreement upon Border, upon BBX Operating, or upon Trinity River were dependent upon the performance by other parties of obligations owed under the Make My Day and Feel Lucky Agreements to Border, to BBX Operating, and/or to Trinity River.

As noted in the Findings of Fact above, the Development Agreement is a valid and enforceable contract, [BP] performed its obligations under the Development Agreement by allowing Defendants and Trinity River perform the seismic testing on the Contract Acreage, Defendants and Trinity River breached Section 3.05(a) of the Development Agreement by failing to disburse to [BP] unused portion of the Drilling Credit it had earned in the amount of $1,302,622. This breach directly caused the harm complained of by [BP].

Therefore, in connection with its claim for breach of contract, the amount of actual damages suffered by [BP] is $1,302,622, which [BP] shall recover from Defendants, jointly and severally.

The district court also found in favor of BP on its alternative claims of quantum meruit and money had and received and concluded that BBX's defenses to performance of the contract, which we discuss below, failed as a matter of law. This appeal by BBX followed.

10

**STANDARD OF REVIEW**

We review the trial court's conclusions of law de novo and its findings of fact for sufficiency of the evidence. *Hegar v. American Multi-Cinema, Inc.*, 605 S.W.3d 35, 40 (Tex. 2020). "A trial court's findings of fact issued after a bench trial have the same weight, and are judged by the same appellate standards, as a jury verdict." *Texas Outfitters Ltd. v. Nicholson*, 572 S.W.3d 647, 653 (Tex. 2019). In a legal-sufficiency review, we view the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822, 827 (Tex. 2005). In a factual-sufficiency review, we consider all the record evidence and set aside the trial court's finding only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *See Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). We defer to the fact finder's implicit determinations of credibility and weight to be given to the evidence. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003).

However, a trial court's interpretation of a contract is a question of law that we review de novo "using well-settled contract-construction principles." *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 763 (Tex. 2018). "When a contract's meaning is disputed, our primary objective is to ascertain and give effect to the parties' intent as expressed in the instrument." *Id.* "Objective manifestations of intent control, not 'what one side or the other alleges they intended to say but did not.'" *Id.* at 763-64 (quoting *Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London*, 327 S.W.3d 118, 127 (Tex. 2010)). We therefore "presume parties intend what the words of their contract say" and interpret contract language according to its "plain, ordinary, and generally accepted meaning" unless the instrument directs otherwise. *Id.* at 764.

## DISCUSSION

**Breach of contract and parol evidence**

In their first issue, BBX assert that the district court erred in concluding that they breached the BP Agreement. According to BBX, the agreement imposed no payment requirement on them. In their view, BBX's "only duty was to disburse funds that were in the Drilling Account," and, "[i]n the absence of funds," there was no provision in the agreement that required BBX to fund the amounts themselves. Relatedly, in their third issue, BBX assert that the district court erred in either excluding or failing to consider Helmueller's testimony relating to the parties' understanding of the agreement during contract negotiations. According to BBX, Helmueller's testimony conclusively established that the parties understood that BBX would not be responsible for making payments to BP.

A plaintiff asserting a breach-of-contract claim must prove that: (1) a valid contract exists; (2) the plaintiff performed or tendered performance as the contract required; (3) the defendant breached the contract by failing to perform or tender performance as the contract required; and (4) the plaintiff sustained damages as a result of the breach. *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 (Tex. 2018).

As BP correctly observes, most of the above requirements are undisputed. It is undisputed that the BP Agreement was a valid and enforceable contract; that BP performed its obligations under the contract by granting BBX access to its Acreage; that BBX performed the seismic testing on BP's Acreage, thereby entitling BP to a $1,302,622 credit; and that BP never received the credit. The parties dispute whether BBX breached the contract by failing to pay that credit to BP.

12

Paragraph 3.05(a) of the BP Agreement provides the following:

**3.05. BP Drilling Account:**

(a) All Seismic Permit Fees and Lease Bonus Fees will be credited by BBX to the "BP Drilling Account." The BP Drilling Account may be unilaterally utilized by BP as a "Drilling Credit" to pay for any well costs or portion thereof, associated with any well(s) drilled pursuant to the Agreement or any future joint well(s) drilled by BBX within the boundaries of the Contract Area in which BP has exercised an option to participate under this Agreement. Upon 30 days written notice to BBX, BP may request BBX disburse to BP all or any portion of the Drilling Credits in the account. At the end of three years after the Effective Date of this Agreement, or if [sic] the termination of this Agreement, whichever event occurs first, BBX shall disburse to BP any Drilling Credit which has not been utilized by BP.

According to this provision, "[a]ll Seismic Permit Fees and Lease Bonus Fees will be credited *by BBX* to the 'BP Drilling Account,'" "[u]pon 30 days written notice to BBX, BP may request *BBX disburse to BP* all or any portion of the Drilling Credits in the account," and "[a]t the end of three years after the Effective Date of this Agreement, or if the termination of this Agreement, whichever event occurs first, *BBX shall disburse to BP* any Drilling Credit which has not been utilized by BP" (emphases added). We conclude that the contract plainly provides that upon termination of the agreement, *BBX shall* disburse to BP any drilling credit that has not been utilized by BP, which in this case amounted to $1,302,622.

Despite the above language, BBX argue that they were not required to disburse this credit to BP because there were no funds in the drilling account at the time BP requested disbursement, and the other parties to the Make My Day Agreement and the Feel Lucky Agreement were solely responsible for funding the account. As support for this contention, BBX rely primarily on the provision in the BP Agreement that it was "made subject to" those other

13

agreements. However, nothing in either the Make My Day Agreement or the Feel Lucky Agreement addresses the BP account or the credits earned by BP under its agreement with BBX, nor do the agreements modify BBX's contractual responsibility for disbursing those credits. At most, those other agreements provided BBX with a method to raise money from other entities, but nothing in those agreements excused BBX from their contractual obligation to disburse to BP the amount of credit that BP had earned or made BBX's disbursement obligation contingent on BBX collecting money from others. To the extent that other companies had payment obligations to BBX under the Make My Day Agreement and the Feel Lucky Agreement, those obligations did not negate BBX's obligations to BP under the BP Agreement. As the district court correctly concluded: "None of the obligations imposed by the Development Agreement upon [BBX], or upon Trinity River were dependent upon the performance by other parties of obligations owed under the Make My Day and Feel Lucky Agreements to [BBX] and/or to Trinity River."

As for the testimony of Helmueller relating to the parties' understanding of BBX's payment obligations during contract negotiations, the district court did not specify in its findings whether it excluded that testimony or simply gave it no weight. Either way, the district court did not err. The BP Agreement contained the following merger clause:

> **7.19. Merger Integration and Amendment:** This Agreement is intended by the parties hereto as a complete and final statement of the Agreement, supersedes and replaces any prior oral or written statements or agreements between the Parties insofar as same cover the Contract Acreage. This Agreement shall not be amended or modified except by an instrument in writing duly executed by the parties hereto or their respective permitted assigns.

The district court concluded that "[a]s a result of the application of this clause, any prior oral statements by the parties during negotiations are not a part of the parties' contractual agreement."

The district court was correct. "When, as here, a contract contains a merger or integration clause, the contract's execution presumes that all prior negotiations and agreements relating to the transaction have been merged into the contract, and it will be enforced as written and cannot be added to, varied, or contradicted by parol evidence." *ISG State Operations, Inc. v. National Heritage Ins. Co., Inc.*, 234 S.W.3d 711, 719 (Tex. App.—Eastland 2007, pet. denied). Thus, any prior oral statements made by the parties during negotiations are not a part of the contract and cannot be considered in interpreting the contract absent an ambiguity. *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) ("An unambiguous contract will be enforced as written, and parol evidence will not be received for the purpose of creating an ambiguity or to give the contract a meaning different from that which its language imports."). Here, the parties do not contend that the BP Agreement is ambiguous, the district court concluded that it was unambiguous, and we agree that the agreement unambiguously required BBX to disburse to BP the credits to which BP was entitled upon termination of the agreement. Accordingly, Helmueller's testimony could not be used to add to, vary, or contradict the BP Agreement, and the district court did not err in either excluding the testimony or giving it no weight.

We overrule BBX's first and third issues.

**Defenses to contract performance**

In their amended answer, BBX pleaded failure to meet a condition precedent and impossibility of performance as defenses to their performance of the contract. The district court concluded that these defenses failed as a matter of law. In their fourth issue, BBX assert that the district court erred in reaching that conclusion. BBX contend that a condition precedent to their

15

disbursement of funds to BP was their receipt of funds from other parties under the Make My Day Agreement and the Feel Lucky Agreement. According to BBX, they had no obligation to disburse funds to BP because they had not received any funds to disburse. Similarly, BBX asserts that "it was impossible for them to make a disbursement in this case because they could not raise the funds under the Make My Day Agreement and Feel Lucky Agreement."

"A condition precedent is an event that must happen or be performed before a right can accrue to enforce an obligation." *Solar Applications Eng'g, Inc. v. T.A. Operating Corp.*, 327 S.W.3d 104, 108 (Tex. 2010) (citation omitted); *see also* Restatement (Second) of Contracts § 224 (1981) ("A condition is an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due."). "In order to make performance specifically conditional, a term such as 'if,' 'provided that,' 'on condition that,' or some similar phrase of conditional language must normally be included." *Criswell v. European Crossroads Shopping Ctr., Ltd.*, 792 S.W.2d 945, 948 (Tex. 1990).

Here, there is no language in the BP Agreement making BBX's disbursement obligation conditional upon BBX receiving payment from other parties to BBX's other agreements. As the district court correctly concluded, "The fact that Defendants and Trinity River requested funds under those agreements, but 'payments were not received,' does not alter or discharge the obligations imposed by the Development Agreement upon Defendants under section 3.05(a) to disburse the unused credit to [BP] in the amount of $1,302,622." We agree with the district court that "the ability for Defendants and Trinity River to obtain [funds] from other parties to the Make My Day and Feel Lucky Agreements is not a condition precedent to the obligation of Defendants and Trinity River to pay [BP] the amount of the unused Drilling Credit."

BBX's impossibility defense similarly fails. Under the doctrine of impossibility or impracticability of performance, a party's performance under a contract is discharged or excused when supervening circumstances make the performance impossible or impracticable, such as the death or incapacity of a person necessary for performance, the destruction or deterioration of a thing necessary for performance, and prevention by governmental regulation. *See Tractebel Energy Mktg., Inc. v. E.I. Du Pont De Nemours & Co.*, 118 S.W.3d 60, 64-65 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); Restatement (Second) of Contracts § 261 (1981); *see also Centex Corp. v. Dalton*, 840 S.W.2d 952, 954 (Tex. 1992); *Garcia v. Baumgarten*, No. 03-14-00267, 2015 WL 4603866, at *5 (Tex. App.—Austin July 30, 2015, no pet.) (mem. op.). Impossibility may be either objective or subjective. *See Janak v. FDIC*, 586 S.W.2d 902, 906-07 (Tex. App.—Houston [1st Dist.] 1979, no writ). Objective impossibility relates solely to the nature of the promise and applies when "the thing cannot be done," while subjective impossibility relates solely to the inability of a party to perform the promise and applies when the thing could be done but a party to the contract "cannot do it" for reasons such as financial hardship. *See Grayson v. Grayson Armature Large Motor Div., Inc.*, No. 14-09-00748-CV, 2010 WL 2361432, at *5 (Tex. App.—Houston [14th Dist.] June 15, 2010, pet. denied) (mem. op.). Objective impossibility excuses performance while subjective impossibility does not. *Janak*, 586 S.W.2d at 906-07.

Here, BBX contend that they cannot disburse to BP the credits to which BP is entitled because BBX does not have the money to do so. That is a matter of subjective impossibility that does not excuse performance. *See Huffines v. Swor Sand & Gravel Co., Inc.*, 750 S.W.2d 38, 40 (Tex. App.—Fort Worth 1988, no writ) ("Texas courts have held contractual obligations cannot be avoided simply because the obligor's performance has become more

economically burdensome than anticipated."); *see also Grayson*, 2010 WL 2361432, at *5 (explaining that subjective impossibility arises when one's "inability to perform as promised is due wholly to [one's] individual inabilities, not due to the nature of the promise," and that "a party cannot escape contract liability by claiming subjective impossibility; subjective impossibility neither prevents the formation of the contract nor discharges a duty created by a contract."). The district court did not err in concluding that BBX's impossibility defense failed as a matter of law.

We overrule BBX's fourth issue. Because we conclude that the district court's judgment may be affirmed on BP's breach-of-contract claim, we need not consider BBX's second issue relating to BP's alternative, quasi-contract theories of recovery. *See* Tex. R. App. P. 47.1.

## CONCLUSION

We affirm the district court's judgment.

_____

Gisela D. Triana, Justice

Before Justices Triana, Theofanis, and Ellis

Affirmed

Filed: May 15, 2026

18